PAUL T. SMITH & others[1] vs. ATLANTIC PROPERTIES, INC. & another.[2]

Suffolk. April 10, 1981. — July 6, 1981.

Present: HALE, C.J., CUTTER, & BROWN, JJ.

*Corporation*, Stockholder, Close corporation. *Fiduciary. Jurisdiction*, Retention of case for further relief. *Injunction. Practice, Civil*, Counsel fees.

Where a minority stockholder in a close corporation repeatedly exercised his voting power to prevent the corporation from declaring dividends even though he had been warned by the other stockholders that failure to declare dividends might result in the imposition of a penalty by the Internal Revenue Service and continued that conduct even after such penalties had been assessed, which resulted in the assessment of further penalties, a judge was warranted in finding that the minority stockholder had breached his fiduciary duty to the other stockholders and in charging the minority stockholder with the expenditure incurred by the corporation for the penalty taxes and related counsel fees. [205-209]

In an action by the majority stockholders of a close corporation against the minority stockholder who had repeatedly exercised his voting power to prevent the declaration of dividends, which resulted in penalty tax assessments against the corporation, the judge's order to the directors of the corporation "to declare a reasonable dividend at the earliest practical date and reasonable dividends annually thereafter" was modified by this court to provide a more explicit statement of the actions to be taken by the directors under the continuing jurisdiction of the Superior Court. [210-211]

In an action by the majority stockholders of a close corporation against the minority stockholder in which the minority stockholder was ordered to reimburse the corporation for certain penalty taxes assessed against it, the judge did not abuse her discretion in the circumstances in denying the plaintiffs' motion for counsel fees. [211-212]

---

[1] Lillian Zimble, executrix of the will of Abraham Zimble, and Louis Zimble. William H. Burke was originally a plaintiff. Prior to his death, Atlantic Properties, Inc., purchased Burke's stock in the corporation and it is now held as treasury stock. Mr. Abraham Zimble, while still living, sold twelve shares to Louis Zimble.

[2] Dr. Louis E. Wolfson.

BILL IN EQUITY filed in the Superior Court on January 30, 1967.

The suit was heard by *Griffin*, J.

*Albert F. Cullen, Jr.* (*David D. Patterson* with him) for Louis E. Wolfson.

*Jeffrey M. Smith* for the plaintiffs.

CUTTER, J.   In December, 1951, Dr. Louis E. Wolfson agreed to purchase land in Norwood for $350,000, with an initial cash payment of $50,000 and a mortgage note of $300,000 payable in thirty-three months. Dr. Wolfson offered a quarter interest each in the land to Mr. Paul T. Smith, Mr. Abraham Zimble, and William H. Burke. Each paid to Dr. Wolfson $12,500, one quarter of the initial payment. Mr. Smith, an attorney, organized the defendant corporation (Atlantic) in 1951 to operate the real estate. Each of the four subscribers received twenty-five shares of stock. Mr. Smith included, both in the corporation's articles of organization and in its by-laws, a provision reading, "No election, appointment or resolution by the Stockholders and no election, appointment, resolution, purchase, sale, lease, contract, contribution, compensation, proceeding or act by the Board of Directors or by any officer or officers shall be valid or binding upon the corporation until effected, passed, approved or ratified by an affirmative vote of eighty (80%) per cent of the capital stock issued outstanding and entitled to vote." This provision (hereafter referred to as the 80% provision) was included at Dr. Wolfson's request and had the effect of giving to any one of the four original shareholders a veto in corporate decisions.

Atlantic purchased the Norwood land. Some of the land and other assets were sold for about $220,000. Atlantic retained twenty-eight acres on which stood about twenty old brick or wood mill-type structures, which required expensive and constant repairs. After the first year, Atlantic became profitable and showed a profit every year prior to 1969, ranging from a low of $7,683 in 1953 to a high of $44,358 in 1954. The mortgage was paid by 1958 and Atlantic has incurred no long-term debt thereafter. Salaries

of about $25,000 were paid only in 1959 and 1960. Dividends in the total amount of $10,000 each were paid in 1964 and 1970. By 1961, Atlantic had about $172,000 in retained earnings, more than half in cash.

For various reasons, which need not be stated in detail, disagreements and ill will soon arose between Dr. Wolfson, on the one hand, and the other stockholders as a group.[3] Dr. Wolfson wished to see Atlantic's earnings devoted to repairs and possibly some improvements in its existing buildings and adjacent facilities. The other stockholders desired the declaration of dividends. Dr. Wolfson fairly steadily refused to vote for any dividends. Although it was pointed out to him that failure to declare dividends might result in the imposition by the Internal Revenue Service of a penalty under the Internal Revenue Code, I.R.C. § 531 et seq. (relating to unreasonable accumulation of corporate earnings and profits), Dr. Wolfson persisted in his refusal to declare dividends. The other shareholders did agree over the years to making at least the most urgent repairs to Atlantic's buildings, but did not agree to make all repairs and improvements which were recommended in a 1962 report by an engineering firm retained by Atlantic to make a complete estimate of all repairs and improvements which might be beneficial.

The fears of an Internal Revenue Service assessment of a penalty tax were soon realized. Penalty assessments were made in 1962, 1963, and 1964. These were settled by Dr. Wolfson for $11,767.71 in taxes and interest. Despite this settlement, Dr. Wolfson continued his opposition to declaring dividends. The record does not indicate that he developed any specific and definitive schedule or plan for a series of necessary or desirable repairs and improvements to Atlantic's properties. At least none was proposed which

---

[3] At least one cause of ill will on Dr. Wolfson's part may have been the refusal of the other shareholders to consent to his transferring his shares in Atlantic to the Louis E. Wolfson Foundation, a charitable foundation created by Dr. Wolfson.

would have had a reasonable chance of satisfying the Internal Revenue Service that expenditures for such repairs and improvements constituted "reasonable needs of the business," I.R.C. § 534(c), a term which includes (see I.R.C. § 537) "the reasonably anticipated needs of the business." Predictably, despite further warnings by Dr. Wolfson's shareholder colleagues, the Internal Revenue Service assessed further penalty taxes for the years 1965, 1966, 1967, and 1968. These taxes were upheld by the United States Tax Court in *Atlantic Properties, Inc.* v. *Commissioner*, 62 T.C. 644 (1974), and on appeal in 519 F.2d 1233 (1st Cir. 1975). See the discussion of these opinions in Cathcart, Accumulated Earnings Tax: A Trap for the Wary, 62 A.B.A.J. 1197-1199 (1976). An examination of these decisions makes it apparent that Atlantic has incurred substantial penalty taxes and legal expense largely because of Dr. Wolfson's refusal to vote for the declaration of sufficient dividends to avoid the penalty, a refusal which was (in the Tax Court and upon appeal) attributed in some measure to a tax avoidance purpose on Dr. Wolfson's part.

On January 30, 1967, the shareholders, other than Dr. Wolfson, initiated this proceeding in the Superior Court, later supplemented to reflect developments after the original complaint. The plaintiffs sought a court determination of the dividends to be paid by Atlantic, the removal of Dr. Wolfson as a director, and an order that Atlantic be reimbursed by him for the penalty taxes assessed against it and related expenses. The case was tried before a judge of the Superior Court (jury waived) in September and October, 1979.

The trial judge made findings (but in more detail) of essentially the facts outlined above and concluded that Dr. "Wolfson's obstinate refusal to vote in favor of . . . dividends was . . . caused more by his dislike for other stockholders and his desire to avoid additional tax payments than . . . by any genuine desire to undertake a program for improving . . . [Atlantic] property." She also determined that Dr. Wolfson was liable to Atlantic for taxes and interest

amounting to "$11,767.11 plus interest from the commencement of this action, plus $35,646.14 plus interest from August 11, 1975," the date of the First Circuit decision affirming the second penalty tax assessment. The latter amount includes an attorney's fee of $7,500 in the Federal tax cases. She also ordered the directors of Atlantic to declare "a reasonable dividend at the earliest practical date and reasonable dividends annually thereafter consistent with good business practice." In addition, the trial judge directed that jurisdiction of the case be retained in the Superior Court "for a period of five years to [e]nsure compliance." Judgment was entered pursuant to the trial judge's order. After the entry of judgment, Dr. Wolfson and Atlantic filed a motion for a new trial and to amend the judge's findings. This motion, after hearing, was denied, and Dr. Wolfson and Atlantic claimed an appeal from the judgment and the former from the denial of the motion. The plaintiffs (see note 1, *supra*) requested payment of their attorneys' fees in this proceeding and filed supporting affidavits. The motion was denied, and the plaintiffs appealed.

1. The trial judge, in deciding that Dr. Wolfson had committed a breach of his fiduciary duty to other stockholders, relied greatly on broad language in *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. 578, 586-597 (1975),[4] in which the Supreme Judicial Court afforded to a minority stockholder in a close corporation equality of treatment (with members of a controlling group of shareholders) in the matter of the redemption of shares. The court (at 592-593) relied on the resemblance of a close corporation to a partnership and held that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one an-

---

[4] Mr. Justice Wilkins (concurring at 604) expressed agreement "with much of what the" majority opinion said in favor of granting relief. He declined, however, to "join in any implication" that certain statements in the opinion applied "to all operations of . . . [a close] corporation as they affect minority stockholders."

other" (footnotes omitted). That standard of duty, the court said, was the "utmost good faith and loyalty." The court went on to say that such stockholders "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." Similar principles were stated in *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 848-852 (1976), but with some modifications, mentioned in the margin,[5] of the sweeping language of the *Donahue* case. See *Jessie* v. *Boynton*, 372 Mass. 293, 304 (1977); *Hallahan* v. *Haltom Corp.*, 7 Mass. App. Ct. 68, 70-71 (1979). See also *Cain* v. *Cain*, 3 Mass. App. Ct. 467, 473-479 (1975).

In the *Donahue* case, 367 Mass. at 593 n. 17, the court recognized that cases may arise in which, in a close corporation, majority stockholders may ask protection from a minority stockholder. Such an instance arises in the present case because Dr. Wolfson has been able to exercise a veto concerning corporate action on dividends by the 80% provision (in Atlantic's articles of organization and by-laws) already quoted. The 80% provision may have substantially the effect of reversing the usual roles of the majority and

---

[5] The court said (at 850-852) that it was "concerned that [the] untempered application of the strict good faith standard . . . will result in the imposition of limitations on legitimate action by the *controlling group* in a close corporation which will unduly hamper its effectiveness . . . . The majority . . . have certain rights to what has been termed 'selfish ownership' in the corporation which should be balanced against the concept of their fiduciary obligation to the minority . . . . [W]hen minority stockholders . . . bring suit . . . alleging a breach of the strict good faith duty . . . we must carefully analyze the action taken by the *controlling stockholders* in the individual case. It must be asked whether the *controlling group* can demonstrate a legitimate business purpose for its action . . . . [T]he *controlling group* in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion, for example, *in declaring or withholding dividends*" (emphasis supplied) and in certain other matters. "When an asserted business purpose . . . is advanced by the majority, however, . . . it is open to minority stockholders to demonstrate that the . . . objective could have been achieved through an alternative course . . . less harmful to the minority's interest."

the minority shareholders.  The minority, under that provision, becomes an ad hoc controlling interest.[6]

It does not appear to be argued that this 80% provision is not authorized by G. L. c. 156B (inserted by St. 1964, c. 723, § 1).  See especially § 8(*a*).  See also *Seibert* v. *Miltion Bradley Co.*, 380 Mass. 656, 658-662 (1980).  Chapter 156B was intended to provide desirable flexibility in corporate arrangements.[7]  The provision is only one of several methods which have been devised to protect minority shareholders in close corporations from being oppressed by their colleagues and, if the device is used reasonably, there may be no strong public policy considerations against its use. See 1 O'Neal, Close Corporations § 4.21 (2d ed. 1971 & Supp. 1980).  The textbook just cited contains in §§ 4.01-4.30 a comprehensive discussion of the business considerations (see especially §§ 4.02, 4.03, 4.06, & 4.24) which may recommend use of such a device.  See also 2 O'Neal § 8.07 (& Supp. 1980 which, at 84-90, discusses the Massachusetts decisions).  In the present case, Dr. Wolfson testified that he requested the inclusion of the 80% provision "in case the people [the other shareholders] whom I knew, but not very well, ganged up on me."  The possibilities of shareholder disagreement on policy made the provision seem a sensible precaution.[8]  A question is presented, however, concerning the extent to which such a veto power possessed by a minori-

---

[6] The majority shareholders, in the event of a deadlock, at least may seek dissolution of the corporation if forty percent of the voting power can be mustered, whereas a single stockholder with only twenty-five percent of the stock may not do so.  See G. L. c. 156B, § 99(*b*), as amended by St. 1969, c. 392, § 23.

[7] See, e.g., Hosmer, New Business Corporation Law, 1964 Ann. Survey Mass. Law §§ 1.1-1.12; Casey, The New Business Corporation Law, 50 Mass. L.Q. 201 (1965); and Boston Bar Assn., Summary of Principal Changes Made by . . . Chapter 156B (1964), reprinted as an appendix in Mass. Gen. Laws Ann., at 429.

[8] Dr. Wolfson himself had discovered the business opportunity which led to the formation of Atlantic, had made the initial $50,000 payment which made possible the Norwood land purchase, and had given the other shareholders an opportunity to share with him in what looked like a prob-

ty stockholder may be exercised as its holder may wish, without a violation of the "fiduciary duty" referred to in the *Donahue* case, 367 Mass. at 593, as modified in the *Wilkes* case. See note 5, *supra*.

The decided cases in Massachusetts do little to answer this question. The most pertinent guidance is probably found in the *Wilkes* case, 370 Mass. at 849-852 (see note 5, *supra*), essentially to the effect that in any judicial intervention in such a situation there must be a weighing of the business interests advanced as reasons for their action (a) by the majority or controlling group and (b) by the rival persons or group.[9] It would obviously be appropriate, before a court-ordered solution is sought or imposed, for both sides to at-

---

ably profitable enterprise. It was reasonably foreseeable that there might be differences of opinion between Dr. Wolfson, a man with substantial income likely to be in a high income tax bracket, and less affluent shareholders on such matters of policy as dividend declarations, salaries, and investment in improvements in the property. The other shareholders, two of whom were attorneys, should have known that it was as open to Dr. Wolfson reasonably to exercise the veto provided to him by the 80% provision in favor of a policy of reinvestment of earnings in Atlantic's properties, which would probably avoid taxes and increase the value of the corporate assets, as it was for them (possessed of the same veto) to use reasonably their voting power in favor of a more generous dividend and salary policy.

[9] The duties and quasi fiduciary responsibilities of minority shareholders who find themselves in a position to control corporate action are discussed helpfully in Hetherington, The Minority's Duty of Loyalty in Close Corporations, 1972 Duke L.J. 921. The author recognizes (at 944) that, in disputes concerning the wisdom of a particular course of corporate action, the majority (or the ad hoc controlling minority) shareholder may be entitled to follow the course he or it thinks best.

The author concludes (at 946) with the general view: "In spite of the . . . imprecision of such criteria for evaluating commercial behavior as good faith, commercial reasonableness, and unconscionability, the courts have moved toward imposing minimum requirements of fair dealing in nonfiduciary business situations. The similarly imprecise concept of fiduciary responsibility, at least as applied to majority shareholders . . . has clearly promoted fair dealing within business enterprises. The majority may not exercise their corporate powers in a manner which is clearly intended to be and is in fact inimical to the corporate interest, or which is intended to deprive the minority of its pro rata share of the present or future gains accruing to the enterprise. A minority shareholder whose

tempt to reach a sensible solution of any incipient impasse in the interests of all concerned after consideration of all relevant circumstances. See *Helms* v. *Duckworth,* 249 F.2d 482, 485-488 (D.C. Cir. 1957).

2. With respect to the past damage to Atlantic caused by Dr. Wolfson's refusal to vote in favor of any dividends, the trial judge was justified in finding that his conduct went beyond what was reasonable. The other stockholders shared to some extent responsibility for what occurred by failing to accept Dr. Wolfson's proposals with much sympathy, but the inaction on dividends seems the principal cause of the tax penalties. Dr. Wolfson had been warned of the dangers of an assessment under the Internal Revenue Code, I.R.C. § 531 et seq. He had refused to vote dividends in any amount adequate to minimize that danger and had failed to bring forward, within the relevant taxable years, a convincing, definitive program of appropriate improvements which could withstand scrutiny by the Internal Revenue Service. Whatever may have been the reason for Dr. Wolfson's refusal to declare dividends (and even if in any particular year he may have gained slight, if any, tax advantage from withholding dividends) we think that he recklessly ran serious and unjustified risks of precisely the penalty taxes eventually assessed, risks which were inconsistent with any reasonable interpretation of a duty of "utmost good faith and loyalty." The trial judge (despite the fact that the other shareholders helped to create the voting deadlock and despite the novelty of the situation) was justified in charging Dr. Wolfson with the out-of-pocket expenditure incurred by Atlantic for the penalty taxes and related counsel fees of the tax cases.[10]

---

conduct is controlling on a particular issue should be bound by no different standard."

[10] We do not now suggest that the standard of "utmost good faith and loyalty" may require some relaxation when applied to a minority ad hoc controlling interest, created by some device, similar to the 80% provision, designed in part to protect the selfish interests of a minority shareholder. This seems to us a difficult area of the law best developed on a case by case basis. See note 4, *supra.*

3. The trial judge's order to the directors of Atlantic, "to declare a reasonable dividend at the earliest practical date and reasonable dividends annually thereafter," presents difficulties. It may well not be a precise, clear, and unequivocal command which (without further explanation) would justify enforcement by civil contempt proceedings. See *United States Time Corp.* v. *G.E.M. of Boston, Inc.* 345 Mass. 279, 282 (1963); *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.,* 361 Mass. 35, 36-39 (1972). It also fails to order the directors to exercise similar business judgment with respect to Dr. Wolfson's desire to make all appropriate repairs and improvements to Atlantic's factory properties. See the language of the Supreme Judicial Court in the *Wilkes* case, 370 Mass. at 850-852, see note 5, *supra.*

The somewhat ambiguous injunctive relief is made less significant by the trial judge's reservation of jurisdiction in the Superior Court, a provision which contemplates later judicial supervision. We think that such supervision should be provided now upon an expanded record. The present record does not disclose Atlantic's present financial condition or what, if anything, it has done (since the judgment under review) by way of expenditures for repairs and improvements of its properties and in respect of dividends and salaries. The judgment, of course, necessarily disregards the general judicial reluctance to interfere with a corporation's dividend policy ordinarily based upon the business judgment of its directors. See *Crocker* v. *Waltham Watch Co.,* 315 Mass. 397, 402 (1944); *Donahue* v. *Rodd Electrotype Co.,* 367 Mass. at 590, and authorities cited; 1 O'Neal, Close Corporations § 3.63a and 2 O'Neal § 8.08; Forced Dividends, 1 J.Corp.L. 420 (1976).

Although the reservation of jurisdiction is appropriate in this case (see *Nassif* v. *Boston & Me. R.R.,* 340 Mass. 557, 566-567 [1960]; *Department of Pub. Health* v. *Cumberland Cattle Co.,* 361 Mass. 817, 834 [1972]), its purpose should be stated more affirmatively. Paragragh 2 of the judgment should be revised to provide: (a) a direction that Atlantic's directors prepare promptly financial statements and copies

of State and Federal income and excise tax returns for the five most recent calendar or fiscal years, and a balance sheet as of as current a date as is possible; (b) an instruction that they confer with one another with a view to stipulating a general dividend and capital improvements policy for the next ensuing three fiscal years; (c) an order that, if such a stipulation is not filed with the clerk of the Superior Court within sixty days after the receipt of the rescript in the Superior Court, a further hearing shall be held promptly (either before the court or before a special master with substantial experience in business affairs), at which there shall be received in evidence at least the financial statements and tax returns above mentioned, as well as other relevant evidence. Thereafter, the court, after due consideration of the circumstances then existing, may direct the adoption (and carrying out), if it be then deemed appropriate, of a specific dividend and capital improvements policy adequate to minimize the risk of further penalty tax assessments for the then current fiscal year of Atlantic. The court also may reserve jurisdiction to take essentially the same action for each subsequent fiscal year until the parties are able to reach for themselves an agreed program.

4. The plaintiff shareholders requested an allowance for counsel fees incurred by them in accomplishing the recovery by Atlantic from Dr. Wolfson of the amounts to be paid by him. The trial judge did not state her reasons for denying the motion for such fees. Whether to grant such an allowance was within her sound discretion. See *Wilson* v. *Jennings,* 344 Mass. 608, 621 (1962), and cases cited; *Cain* v. *Cain,* 3 Mass. App. Ct. at 479; Nolan, Equitable Remedies § 244, at 366 (1975). We perceive no abuse of discretion. She was entitled to take into account the considerations mentioned in note 8, *supra,* and that the controversy involved issues of business judgment and somewhat novel legal questions. See note 10, *supra.* She also properly could give weight to (a) the circumstance that no fraud or diversion of Atlantic's assets was engaged in by Dr. Wolfson, and (b) the portions of the evidence suggesting that the plaintiffs

may have been in some measure responsible for the intensity of the bad feeling among the stockholders.

5.. The judgment is affirmed so far as it (par. 1) orders payments into Atlantic's treasury by Dr. Wolfson. Paragraph 2 of the judgment is to be modified in a manner consistent with part 3 of this opinion. The trial judge's denial of the plaintiff's motion to be allowed counsel fees is affirmed. Costs of this appeal are to be paid from the assets of Atlantic.

*So ordered.*