# United States Court of Appeals
# For the First Circuit

—————————————

No. 01-2348

MEDICAL AIR TECHNOLOGY CORPORATION,
Plaintiff, Appellant,

v.

MARWAN INVESTMENT, INC.; MARWANI HOLDING COMPANY, N.V.;
MULTIFINANCE HOLDING CORPORATION; AND DR. K. PHILIP RAHBANY,
Defendants, Appellees.

—————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

—————————————

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

—————————————

Louis N. Massery with whom Massery & Gillis, LLP, Albert L. Farrah Jr., and Corwin & Corwin, LLP were on brief for appellant.

James W. Prendergast with whom Michael G. Bongiorno, Peter J. Kolovos, Barbara Van Gorder, and Hale and Dorr LLP were on brief for appellees.

—————————————

August 14, 2002

—————————————

**LYNCH**, **Circuit Judge**.  Medical Air Technology appeals a judgment rendered after a bench trial involving a closely held corporation's financial travails and allegations of fiduciary violations by one of its investors.  The plaintiff Medical Air, the closely held corporation, presents two claims of error: 1) that the district court applied the wrong legal standard for a shareholder's fiduciary duty to a closely held corporation; and 2) that the district court judge improperly found that Medical Air had waived its right to a jury trial against all of the defendants, and not just one of the defendants.  We affirm the district court's judgment, because the defendants were not in breach of any fiduciary duties owed, and because there was no evidence that the defendants' actions caused the harm that Medical Air suffered.  The reasoning we use in affirming that judgment renders Medical Air's claim, if any, to a jury trial irrelevant and disposes of all claims in the case.

## I.

Medical Air is a closely held corporation, incorporated in 1992, which sold air purification equipment to medical facilities.  In search of financing, Medical Air executed an agreement in January 1996 with Multifinance Holding Company ("MFH").  MFH used two related holding companies, Marwan Investment and Marwani Holding Company, to structure the deal.  Dr. Kalil Philip Rahbany was the President of MFH and an agent of Marwan Investment and Marwani Holding.

The agreement resulted in a total of $1.375 million in funding for Medical Air: a $625,000 loan from Marwan Investment and a $750,000 purchase of preferred stock by Marwani Holding. Medical Air signed an Investment and Stockholders Agreement, a Secured Promissory Note for the loan, and a Security Agreement. It also amended its Articles of Organization. The Security Agreement was executed by Medical Air and Marwan Investment only and served to secure the loan from Marwan Investment. It contained a jury waiver, which provided that:

> Grantor [Medical Air] and Marwan hereby waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of this Security Agreement, the Investment and Stockholders Agreement or any other agreement evidencing, securing, or otherwise executed in connection with any Obligations.

The Security Agreement defines "Obligations" as:

> any and all indebtedness, obligations, agreements and liabilities of either Grantor to Marwan including, without limitation, all indebtedness and obligations of Grantor under the Investment and Stockholders Agreement, the Notes executed pursuant thereto, and any other indebtedness, obligations, agreements and liabilities of Grantor to Marwan of every kind and description, direct or indirect, absolute or contingent, due or to become due, regardless of how they arose or were acquired, now existing or hereafter arising.

MFH and Medical Air also entered into a Consulting Agreement, under which MFH would provide specified consulting services to Medical Air for the fee of $4,000 a month. Medical Air's President, Frank Paradise, took the lead in negotiating the deal. Medical Air was represented by counsel in the negotiations and the drafting of the investment agreements, as were the defendants.

3

Within a few months, the relationship had soured. In May, 1996, Medical Air failed to meet the minimum net worth and net working capital requirements to which it had agreed in the Investment and Stockholders Agreement. The Investment and Stockholders Agreement specified that if Medical Air defaulted on these terms, then Marwan Investment could accelerate the loan, making it immediately payable, and Marwani Holding could immediately seek to redeem its stock. If Medical Air failed to redeem the stock within six months, under the amended Articles of Organization, its Board of Directors would double in size plus one, and Marwani Holding could appoint the new Board members. Thus, if the stock was not redeemed after default, control of Medical Air would shift to Marwani Holding.

Medical Air attempted to obtain the defendants' permission to issue additional stock in the hope that increased funding would allow it to expand its production capacity to take advantage of some inchoate sales opportunities. The defendants opposed this plan, fearing it would dilute their interest in the company. Medical Air then presented the defendants with the possibility of a buy-out by an outside investor, but the defendants were not interested.

Instead, between July 8 and August 15, 1996, the defendants sent three separate notices of default to Medical Air and threatened litigation. Efforts were made to restructure the business, but these were unsuccessful. In the August 15 notice, Marwan Investment exercised its right to demand acceleration of the

4

loan and, the following month, Marwani Holding requested that Medical Air redeem its stock. In response, Medical Air began to look for a new investor to buy out the defendants. During this time, the defendants chose not to exercise their security rights against Medical Air, waiting to see if Medical Air could secure new funding. The parties agree that, by the fall of 1996, Medical Air was out of money to fill orders and, to put it mildly, not doing well.

A company called Nortek, Inc., expressed some interest in a merger with Medical Air. On November 8, 1996, Nortek and Medical Air signed a non-binding letter of intent, which proposed that Medical Air's shareholders would receive 500,000 shares of Nortek common stock, worth about seven to ten million dollars. Nortek reserved decision on a final purchase price for Medical Air until it saw whether Medical Air could meet its sales projections for the fourth quarter of 1996. Medical Air quickly scheduled a shareholders' meeting for January 8, 1997. Notices of the meeting and proxy were sent to Medical Air shareholders on December 19, 1996.

On November 19, after receiving Nortek's letter of intent, Rahbany requested from Medical Air the due diligence material provided to Nortek. Under the Investment and Shareholders Agreement, Marwani was entitled to receive any reasonably requested information within five business days. Rahbany says he was particularly interested in any financial forecasts Medical Air had made, because he wanted to assess whether Nortek's interest in

5

Medical Air had a realistic basis. This concern was not unfounded; at trial, Medical Air's financial adviser testified that he warned Medical Air that, once Nortek had seen the due diligence materials, it would attempt to negotiate a lower purchase price.

Rahbany says he repeatedly requested the information over two months, but never received copies of what had been provided to Nortek. Medical Air, in turn, was "reluctant to produce the documents because" corporate officials felt that the defendants were "going fishing" for evidence for their litigation in the default suit. Medical Air also asked the defendants to identify the specific items they wanted, and the reasons for each. The defendants refused, and reiterated their request for all the due diligence documents. At Medical Air's request, the defendants signed a non-disclosure agreement, agreeing not to disclose any information about the proposed merger.

Medical Air says that it supplied Rahbany with the information that it judged to be necessary for Rahbany's review of the proposed deal, including a <u>listing</u> of the due diligence materials (but not the materials themselves). Medical Air's CEO testified that he did not recall if he ever supplied the defendants with the fourth quarter sales projections provided to Nortek. Medical Air's financial adviser who worked on the merger deal testified that he never provided the defendants with the due diligence materials.

On December 31, 1996, Medical Air sent a draft merger agreement and certain other draft documents to shareholders for

6

review.  The defendants say that they were not able to assess the deal in part because the terms, including the purchase price, had not been finalized at that time.  According to the Medical Air attorney who worked on the deal, merger terms are never final until the closing, and it is customary for shareholder votes to take place before the merger documents are finalized.  The defendants also say that they were unable to assess the viability of the deal because Medical Air's fourth quarter financial results were not yet available.  The defendants had certain other problems with the draft documents: the draft merger agreement stated that Marwan Investment's loan would be repaid at the original interest rate, rather than the default interest rate triggered by Medical Air's May 1996 default (a difference of less than $25,000); the shares that Marwani Holding would receive in the proposed merger would not be immediately saleable; and a portion of the shares would be subject to loss if the warranties that Medical Air made in the merger proved to be false.  Finally, the draft merger failed to give Marwani Holding preferred shareholder rights, although Medical Air's amended Articles of Organization stated that any merger would make "appropriate provisions" to provide the same privileges to preferred stockholders "as nearly as may be, with respect to any shares of stock or securities" received in a merger.

Five days before the scheduled vote, the parties met to discuss the proposed merger. At that meeting, the defendants asked for five pieces of information: a statement from Nortek that due diligence was satisfactory; a patent assignment release; an

7

explanation of how the default loan interest rate would be dealt with; a copy of the November financial statements; and a valuation of the company. Medical Air says it provided the November financial statements, and a valuation of the defendants' stock under the proposed merger plan (between $1.4 and $1.8 million) to the defendants' counsel on the following day. Rahbany says he was not given sufficient information to determine if that valuation was a credible number, and says that he never received the November financial statements. At that time, the December financial statements were not yet ready. Rahbany admitted at trial that he never reviewed the public records of Nortek to try to assess the basis for Nortek's interest in Medical Air.

Medical Air failed to meet its fourth quarter 1996 projections; it had projected sales of $750,000 for the quarter, but realized only $236,000. Medical Air blames this failure on its problems with the defendants, which it said were distracting its principal officers from business and demoralizing its sales force.

A day or two before the vote, Medical Air's president, Frank Paradise, was told by an associate of his that Marwani planned to vote against the deal. Medical Air says that, as a result of learning that Marwani intended to vote against the deal, it reopened negotiations with Nortek on the day before the scheduled vote. The memory of Nortek's representative was that the negotiations were reopened because Medical Air had failed to meet its fourth quarter projections.

At the January 8 vote, Marwani Holding voted against the merger. All other shareholders voted for the merger. Marwani Holding, holding almost 15% of the shares, was able to single-handedly defeat the merger because Nortek, as part of the proposed merger agreement, had required a minimum of 95% stockholder agreement. Still, the terms of the Investment and Stockholders Agreement appeared to allow Medical Air to proceed with a merger without the defendants' approval if the Medical Air Board of Directors certified that the purchase price met a certain "qualifying price" defined in the Agreement. This was never done.[1]

Rahbany testified that he voted against the merger because

> I wanted at the same time to know how viable, to find the basis, because I had a fiduciary responsibility to cast a vote, and I had to have a reasonable basis for my action. And when you don't know what you're doing, you don't do anything.

He also testified that he voted against the deal because he did not think that the deal was viable. He admitted that one of the purposes of his vote was to advance the purposes of Marwan Investment, but stated that he "had in mind the multiple entities that [he] represented all the time and also the separateness all the time." After the shareholders' meeting, Marwani's attorney, who tendered the proxy vote, told Medical Air's attorney that the

---

[1] Rahbany testified that one of the reasons justifying his suspicions of the deal was Medical Air's failure to certify the purchase price, although he did not voice that suspicion to Medical Air at the time.

9

Medical Air principals would make a lot of money from the proposed merger, while Rahbany was coming up short.

Medical Air and Nortek continued negotiations, and later in January 1997 Nortek signed a second letter of intent offering 250,000 shares, while providing that the purchase price would not exceed $6.25 million. The defendants, for their part, continued to request more information. The merger ultimately did not go through, and Medical Air blames this on the legal problems caused by the defendants. Medical Air does not argue, however, that the defendants violated any fiduciary duty with respect to their actions following the January 8 vote.

II.

In April 1997, Medical Air filed a diversity suit in the District of Massachusetts, seeking a declaration that it was not in default to the defendants, an injunction against the sale of its assets, and damages for breach of contract, negligence and other claims based on Marwani Holding's vote against the merger. On January 26, 1998, the district court found that, as of May 1996, Medical Air was in default of its responsibilities under the Investment and Stockholders Agreement, and permitted Marwan Investment to sell Medical Air's assets. Medical Air Tech. Corp. v. Marwan Inv., Inc., No. 97-10764-JLT (D. Mass. Jan. 26, 1998). Medical Air does not appeal this judgment.

The defendants did not immediately enforce their security rights against Medical Air; they say they were waiting to see if Medical Air could find a way to pull itself out of its financial

10

hole.  In August 1998, Marwan Investment began foreclosure proceedings against Medical Air.  At public auction in November 1998, Marwan Investment bought all of Medical Air's remaining assets with a credit bid of $150,000.  Marwan says Medical Air still owed a debt of $1,015,236 to Marwan on the 1996 loan.  The defendants then moved for a dismissal of Medical Air's case, arguing that their foreclosure purchase had included Medical Air's rights in this case.  The district court denied that motion on June 22, 1999.  It also denied a motion by Medical Air's shareholders to intervene.

On August 10, 2000, the defendants filed a motion to strike Medical Air's jury demand.  On January 12, 2001, the court heard argument on the jury waiver issue.  Medical Air's counsel argued that when Medical Air signed the Security Agreement it did not understand that it was waiving jury trial, but he conceded that the Security Agreement effected a valid waiver of the right to jury with respect to Marwan Investment.  Nonetheless, he argued that Medical Air had not waived jury trial for any of the other defendants.  The district court judge expressed concern about the feasibility of having a bench trial for one defendant and a simultaneous jury trial for the others.  The defendants argued that the plaintiff had presented a claim under Mass. Gen. L. ch. 93A, which could not be considered by a jury, and so the judge "would have to make findings that would be the mirror findings of" the jury findings.  The court did not conduct an evidentiary hearing (none had been requested), but both parties had submitted

11

affidavits. The court allowed the motion to strike the jury demand without issuing a written order explaining the basis for its decision. However, it appears that the trial judge believed that, in a case arising out of a single transaction and presenting claims against multiple defendants, a waiver against one was a waiver against all.[2]

After the court ruled on the defendants' summary judgment motion, three of Medical Air's claims remained for trial: 1) breach of contract and of the implied covenant of good faith and fair dealing as to MFH and Marwani Holding; 2) breach of fiduciary duty as to Marwani Holding; and 3) tortious interference with contractual and business relations as to all the defendants.

At the conclusion of the four day bench trial, the district court ruled for the defendants on each of Medical Air's remaining claims and entered judgment in the amount of $1,015,236, plus post-trial interest, for Marwan Investment on its counterclaim

---

[2] The court initially noted, "If I understand correctly, regardless of whether you think -- you talk in terms of integrated documents or anything else, it is very, very clear that the plaintiff waived jury; is that right?" Medical Air's counsel responded by arguing that the only waiver was in the Security Agreement, and it applied only to Marwan Investment. The judge then said:

But you did waive. With respect to this case, you waived jury.

. . .

Do you know of any precedent where you can waive with respect to one defendant and not with respect to another? I have never tried a case like that. I would not know how to preside. . . . I am just talking about within the cast, the traditional cast, of a transaction, one plaintiff, four people, some actual signatory, some by inference, perhaps, but the plaintiff says, I waive jury. Doesn't that count for everything?

12

based on Medical Air's default of the Investment Agreement. It also ruled for the plaintiffs on the defendants' good faith counterclaim. Med. Air Tech. Corp. v. Marwan Inv., Inc., No. 97-10764-JLT (D. Mass. Aug. 21, 2001).

### III.

On appeal to this court, Medical Air primarily challenges two of the district court's rulings: its order dismissing the jury demand, and its ruling that Marwani Holding was not in breach of its fiduciary duty as a stockholder. The defendants defend the court's rulings on the grounds given by the district court. They also argue, in the alternative, that the district court's judgment should be upheld because Marwan Investment became the assignee of Medical Air's right to pursue this case when it bought all Medical Air's assets in foreclosure.

### A. Jury Trial

Medical Air argues that the trial judge erred in granting the defendants' motion to strike Medical Air's jury demand as to its claims against Dr. Rahbany, MFH, and Marwani Holding, because only Marwan Investment was party to the Security Agreement which contained the jury waiver.

The confusion on this issue evident in the record leads us to review basic principles. There is a presumption against denying a jury trial based on waiver, and waivers must be strictly construed.[3] Aetna Ins. Co. v. Kennedy ex rel. Bogash, 301 U.S.

---

[3] The circuits are currently split on the question of which party bears the burden of proof as to whether a contractual jury

13

389, 393 (1937) ("[A]s the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver."); Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1166 n.21 (9th Cir. 1996). In a diversity jurisdiction suit, the enforcement of a jury waiver is a question of federal, not state, law. See Simler v. Conner, 372 U.S. 221, 222 (1963).

In general, a contractual waiver binds only the parties who sign the contract. See EEOC v. Waffle House, Inc., 122 S. Ct. 754, 764 (2002) ("It goes without saying that a contract cannot bind a nonparty."). In Waffle House, the Supreme Court held that the EEOC was not bound by an employer-employee contractual arbitration agreement, reasoning that "[a]bsent some ambiguity in the agreement, . . . it is the language of the contract that defines the scope of disputes subject to arbitration," and therefore even the federal policy favoring arbitration does not "authorize[] a court to compel arbitration . . . by any parties . . . that are not already covered in the agreement." Id. at 762.

There are some exceptions to this rule. For instance, some courts have applied a theory of equitable estoppel for suits against non-signatories arising out of the contract itself,

---

trial waiver was knowing and voluntary. See Pierce v. Atchison Topeka & Santa Fe Ry. Co., 110 F.3d 431, 435 n.4 (7th Cir. 1997) (collecting cases); Hulsey v. West, 966 F.2d 579, 581 (10th Cir. 1992). We have not yet ruled on this point, although a district court within this circuit has held that the party seeking to enforce the waiver bears the burden. See Luis Acosta, Inc. v. Citibank, N.A., 920 F. Supp. 15, 18 (D.P.R. 1996). In the analogous situation of a release of claims against an employer, we have held that the party seeking to enforce the release bears the burden of proof. See Melanson v. Browning-Ferris Indus., 281 F.3d 272, 276 (1st Cir. 2002). We need not resolve the issue here.

reasoning that the party seeking the benefit of a contract could not refuse to be bound by a clause contained within it. E.g., Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527-31 (5th Cir.), cert. denied, 531 U.S. 1013 (2000); MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947-48 (11th Cir. 1999); Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 & n.9 (7th Cir. 1981).

In general, though, we look to the plain language of the contract's jury waiver to determine whether it unambiguously covers the claims asserted. In cases where the contractual language is ambiguous, simultaneously executed documents may be relevant as a matter of contractual interpretation. In Massachusetts, "if the parties execute two or more documents, with a manifested intent that the documents together express their entire agreement, a court reads the documents together, rather than construing each as if it stood alone." Donoghue v. IBC USA (Publ'ns), Inc., 70 F.3d 206, 212 (1st Cir. 1995); see also FDIC v. Singh, 977 F.2d 18, 21-22 (1st Cir. 1992); Chase Comm. Corp. v. Owen, 32 Mass. App. Ct. 248, 588 N.E.2d 705, 707 (1992); cf. Paracor Fin., 96 F.3d at 1165 (holding that this is "a principle of interpretation [which] does not mean that contemporaneously executed documents somehow become a single unified contract binding all signatories to all provisions").

Even once it is determined that a contractual jury waiver clause does encompass the asserted claims, courts will not enforce the jury waiver unless it was entered into knowingly and

15

voluntarily.  See Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1990); Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 837 (10th Cir. 1988) (jury waiver may not be fraudulently induced); K.M.C. Co. v. Irving Tr. Co., 757 F.2d 752, 755-56 (6th Cir. 1985).  In cases such as this, where the jury waiver was part of a separate contract, signed only by certain parties to the larger transaction, non-signatory parties seeking enforcement of the waiver may have a more difficult task in showing that the waiver was voluntary and knowing.  This is, however, a fact-based inquiry.[4]  See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 182 (1st Cir. 1995).

Medical Air has conceded that it made a valid jury waiver with regards to all claims against Marwan Investment.  The record is sparse as to the basis for the trial court's ruling.  We do not, though, need to decide the issue.  As we hold below, no reasonable jury could find liability for breach of fiduciary duty against Marwani Holding nor a causal link between Marwani Holding's vote at the January 8 board meeting and the failure of the proposed merger with Nortek.

---

[4] In analogous situations we have looked to the "totality of the circumstances," including factors such as the waiving party's education and business experience, the respective roles of the parties in determining the terms of the waiver, the clarity of the agreement, the amount of time the waiving party had to consider the waiver, whether the waiving party was represented by counsel, and the consideration offered for the waiver, to determine if the waiver was knowing and voluntary.  Melanson, 281 F.3d at 276 & n.4 (waiver of Title VII rights through release of claims against employer); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181-82 (1st Cir. 1995) (waiver of ERISA pension benefits).

Because the core ruling is correct and none of Medical Air's claims could survive a motion for judgment as a matter of law, the jury waiver question is no longer viable. See Segrets v. Gillman Knitwear Co., 207 F.3d 56, 64 (1st Cir. 2000); In re N-500L Cases, 691 F.3d 15, 25 (1st Cir. 1982). See generally 9 C. Wright & A. Miller, Federal Practice and Procedure § 2322 n.6 (2d ed. 1995 & Supp. 2002) (collecting cases).

B.  Fiduciary Duty

1.  Alleged Breach of Duty

Under Massachusetts law, shareholders in a close corporation owe a fiduciary duty of "utmost good faith and loyalty." Zimmerman v. Bogoff, 402 Mass. 650, 524 N.E.2d 849, 853 (1988) (quoting Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)) (internal quotation marks omitted). This is a higher standard than a simple "good faith and inherent fairness" standard. Donahue, 328 N.E.2d at 515-16. The Massachusetts Supreme Judicial Court (SJC) has articulated a two-part test for determining if this fiduciary duty has been violated. First, the defendant must show a legitimate business purpose for its action that allegedly is a breach. If the defendant makes such a showing, the burden shifts to the plaintiff to show that "the proffered legitimate objective could have been achieved through a less harmful, reasonably practicable, alternative mode of action." Zimmerman, 524 N.E.2d at 853. Then the court "must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative." Wilkes v. Springside Nursing Home,

17

370 Mass. 842, 353 N.E.2d 657, 663 (1976). In applying this test, courts must be sure not to "unduly hamper . . . effectiveness in managing the corporation in the best interests of all concerned." Id. Moreover, "mere errors of judgment" do not constitute a fiduciary breach. Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895, 904 (1937).

Donahue itself involved an attempt by majority stockholders to freeze out minority shareholders. 328 N.E.2d at 509-11. See generally Peter M. Rosenblum, Corporate Fiduciary Duties in Massachusetts and Delaware, in How to Incorporate and Counsel a Business (Massachusetts Continuing Legal Education, Inc. 1999). By contrast, this case involves actions by 15% minority shareholders. Massachusetts law is clear that minority shareholders in close corporations also have fiduciary responsibilities. See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5-6 (1st Cir. 1997); Zimmerman, 524 N.E.2d at 853; Donahue, 328 N.E.2d at 517; Smith v. Atl. Props., Inc., 12 Mass. App. Ct. 201, 422 N.E.2d 798, 801-02 (1981). Chesterton and Smith involved situations in which unilateral action by minority shareholders would result in dire tax consequences to the majority shareholders. See A.W. Chesterton Co., 128 F.3d at 3; Smith, 422 N.E.2d at 800. Further, because the financial obligations were owed to the government, there was no market mechanism to determine the consequences of the action. In that sense, the minority shareholders had effective control over one aspect of corporate finances. Here, by contrast, the defendants did not inherently

18

have effective control. Their 15% was needed only because the outside purchasers set as a condition of sale that 95% of the shareholders approve the merger. The Donahue rule itself involves a balancing of legitimate interests, and the scope of the duties owed may depend, in part, on context. See Zimmerman, 524 N.E.2d at 853 ("[T]he Donahue remedy is not intended to place a strait jacket on legitimate corporate activity.")

The district court here found that "[l]acking th[e] information [concerning the basis for the merger, the final terms of the merger, or the price that would be paid], Marwani certainly had a legitimate business reason for voting against the merger" and, further, that Medical Air's refusal to provide the requested information "left Marwani with no choice but to vote against merger." The district court then found that the only alternative advanced by Medical Air was for Marwani simply to vote for the Nortek merger, an alternative that totally failed to address the problems with the deal itself. This showing does not meet the plaintiff's burden.

Medical Air argues that the district judge improperly construed the Massachusetts law governing fiduciary duty in closely held relationships by holding that Marwani Holding's own business interests could be a proper motivating factor for the vote. It argues that Marwani's vote against the merger was not motivated by legitimate business interests, saying that the vote was really motivated by the defendants' own self-interest -- specifically, that Marwani wanted more of the proceeds of the merger to go to

19

Marwan, rather than the Medical Air principals. It says that Marwani's vote against the merger was intended to pave the way for Marwan's foreclosure of Medical Air's assets, given that Medical Air's financial situation was so desperate in January 1997 that the merger was the only way to salvage the business. Medical Air relies heavily on Rahbany's testimony admitting that he did take Marwan Investment's and Marwani Holding's interests into consideration in his decision. It also relies on the statement that Marwani Holding's counsel allegedly made after the January 8 vote, complaining that Rahbany would not make enough money out of the proposed deal.

Medical Air mischaracterizes the trial court's holding. The trial court held that Marwani Holding had a legitimate purpose in voting against the merger when it had not been provided material information about the merger and perceived a risk that the proposed merger was made of gossamer. That legitimate purpose is not negated if Marwani Holding's vote also coincided with its self-interest.

We reject Medical Air's argument that a minority shareholder may never, under the Donahue rule, take its own interest into account in deciding its vote. Such an argument is both unrealistic and too biased. The SJC has observed that stockholders in a close corporation "may not act out of avarice, expediency, or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." Blank v. Chelmsford OB/Gyn, P.C., 420 Mass. 404, 649 N.E.2d 1102, 1105

20

(1995) (emphasis added); see also Donahue, 328 N.E.2d at 515 (using same language). But self-interest may be a proper motive for a stockholder's actions, so long as that interest does not result in acts in derogation of the stockholder's fiduciary duty. The SJC has held that majority stockholders "have certain rights to what has been termed 'selfish ownership' in the corporation which should be balanced against the concept of their fiduciary obligation." Wilkes, 353 N.E.2d at 663. We think that principle extends, at least in part, to minority stockholders, although their interests are somewhat different in character. See A.W. Chesterton Co., 128 F.3d at 7 (noting that minority stockholders may control some aspects of a corporation but not others). Admittedly, there may be tensions between the two types of interests -- loyalty to the corporation and selfish ownership. Difficult cases will arise where the dividing line is not clear. This is not one of those cases.

The district court correctly found that Marwani Holding had shown a legitimate business rationale for the vote against the merger. To begin with, Marwani Holding did lack material information about the proposed merger and Medical Air had failed to provide Marwani Holding with the requested due diligence materials. Marwani Holding also had a suspicion, reasonable in context, that the deal was based on unrealistic assumptions that would ultimately doom it, and that it served only as a distraction from the real problems facing Medical Air. This suspicion was well-founded; Medical Air's CEO admitted at trial that the fourth quarter sales

21

estimates for 1996 provided to Nortek were above what Medical Air had ever accomplished before and far exceeded its actual fourth quarter sales results. These reasons more than suffice to show a legitimate business reason for Marwani's vote.

Upon this showing, the burden shifted to Medical Air to show that there was "a less harmful, reasonably practicable, alternative mode of action" other than the vote against the merger. Medical Air has not made any such showing. The district court found that Medical Air's proposed alternative -- that Marwani could have simply voted for the merger -- is not a reasonable and practicable alternative, given Marwani's legitimate concerns about what form the deal would ultimately take, or whether the whole deal was simply a chimera. Its finding was compelled by the evidence.

2. Causation

The defendants argue in the alternative that, even if Marwani Holding had violated a fiduciary duty in voting against the merger, it was not the cause of the merger's failure. We agree. Nortek's CEO testified at trial (through deposition) that after Nortek saw the fourth quarter sales results, it decided that it should pay less than was offered in the original letter of intent and reopened negotiations with Medical Air. The renegotiated offer from Nortek, as expressed in the second letter of intent, provided only half what was offered in the deal before the Board at the January 8 vote. It is clear that Nortek was not willing to go through with the terms of the earlier proposed merger put before the Board that Marwani voted against. Even if Marwani Holding had

22

voted for the proposed merger, it would have made no difference. Medical Air still would have been in the same position as it was after the January 8 vote, negotiating new terms with Nortek. No reasonable jury could find that Marwani Holding's vote was the proximate cause of the demise of the proposed Nortek merger.

C. Other Claims

The plaintiff's other claims are similarly lacking in merit. The remaining questions decided by the district court in the bench trial were: a claim against MFH for breach of the consulting agreement; a breach of the implied covenant of good faith and fair dealing against Marwani Holding based on its vote against the Nortek merger; and tortious interference with contractual relations against Rahbany, MFH, and Marwani Holding for their actions with regard to the Nortek merger.[5] The latter two claims must fail, for the same reasons that the fiduciary duty claim against Marwan Holding fails. Neither Rahbany nor MFH took any actions with regards to the Nortek deal that were separate from the actions taken by Marwan Holding, discussed above. Medical Air has not presented any evidence to indicate that these actions, rather than Medical Air's inability to meet fourth quarter sales projections, caused the proposed merger before the Board on January 8 to fail. Without causation, there can be no claim for tortious interference, see United Truck Leasing Corp. v. Geltman, 406 Mass.

---

[5] Medical Air did not appeal the merits of the district court's rulings on these claims. We consider the question only for the purpose of Medical Air's appeal of the denial of a jury trial on all of its claims against MFH, Rahbany and Marwani Holding.

23

811, 551 N.E.2d 20, 21 (1990), or for a breach of the implied covenant of good faith and fair dealing, see Druker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 348 N.E.2d 763, 765 (1976) ("'[I]n every contract there is an implied covenant [of good faith and fair dealing] that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .'") (quoting Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936)); MacGillivary v. W. Dana Bartlett Ins. Agency of Lexington, Inc., 14 Mass. App. Ct. 52, 436 N.E.2d 964, 967 (1982).

That leaves only Medical Air's claim that MFH violated its contractual obligations under the consulting agreement. The district court outlined the alleged claim well in its opinion. The consulting agreement required MFH to provide "financial and strategic corporate planning services" to Medical Air "including, by way of example: (i) assisting [Medical Air] in attracting a new senior leader; (ii) evaluating and helping source transactions such as acquisitions, joint ventures and public offerings; and (iii) assisting [Medical Air] in developing financial and operating reporting systems." Medical Air's CEO, Stephen Hague, testified that MFH did nothing to help attract a new lender or to develop financial and operating reporting systems. However, Hague also testified that he met on a monthly basis for a few hours with the consultant provided by MFH, as well as speaking with him on the phone for a few hours each month. During these meetings, the

24

consultant reviewed the operation of the company and proposals for the company. According to Hague, the consultant encouraged Medical Air to expand its sales force rapidly; assisted in putting together an expansion plan; recommended and outlined the creation of a business advisory board; and investigated at least one possible acquisition. The consultant also occasionally interviewed or spoke with sales representatives. In addition, Medical Air did effect changes in its accounting procedures during this time period; the consultant was copied on the relevant documents, but the record is not clear as to what his level of participation was.

In August 1996, the consultant who had been working with Medical Air ceased to work for MFH. In September, Medical Air stopped paying the $4,000 per month consultancy fee. In October 1996, Medical Air met with a new individual that MFH had appointed to replace the previous consultant, but that was the last service provided under the consultancy agreement. At this point, Medical Air was already in default of its obligations under the Investment and Stockholders Agreement.[6]

Based on the information provided by Medical Air's CEO, we doubt that Medical Air has presented enough evidence on this claim for it to go to a jury. It is undisputed that the MFH consultant worked with Medical Air throughout the relevant time period and provided input on the business's development. As the

---

[6] Medical Air did not argue that MFH's breach was based on the failure to provide ongoing consultancy services after September 1996.

25

district court noted, the fact that the MFH consultant did not achieve all of the goals laid out "by way of example" in the consulting agreement did not constitute breach, given how quickly the entire relationship disintegrated and the agreement's lack of any time frame for achieving these goals.

Regardless of the strength of the claim, however, the claim is no longer Medical Air's to make.  Marwan Investment purchased all the assets of Medical Air at the foreclosure sale in November 1998.  The description of assets included  "all rights, claims, counterclaims, crossclaims, demands, recoveries and defenses in connection with or asserted or which may be asserted by Medical Air in that certain litigation styled Medical Air Technology Corporation v. Marwan Investment . . . pending in the United States District Court for the District of Massachusetts." Under Massachusetts law, claims for breach of contract are generally assignable.[7]  Raymer v. Bay State Nat'l Bank, 384 Mass. 310, 424 N.E.2d 515, 518 (1981); see also SAPC, Inc. v. Lotus Dev. Corp., 921 F.2d 360 (1st Cir. 1990).  Although there may be cases in which public policy concerns merit the creation of an exception to that rule when the claim has been involuntarily assigned through a foreclosure sale, this is not such a case.  If the claim for breach of the consulting agreement constituted a defense to the defendants' claim of default, or if it would have saved Medical Air

---

[7]  The defendants have argued that all of Medical Air's claims are assignable, whether or not they sound in contract.  We need not decide this point, as we have disposed of Medical Air's other claims on other grounds.

26

as an ongoing concern, than Medical Air should have raised this as a defense to the defendants' summary judgment motion on the default claim.  Medical Air did not do so, nor did it raise any contemporaneous objection to the inclusion of its rights in this matter in the assets foreclosure sale.

Conclusion

The district court's decision is <u>affirmed</u>.  No costs are awarded.