Fecteau, J.
In connection with an action by the plaintiff, Jane Ellis (“Ellis”), a minority shareholder of Varney Bros. Sand & Gravel, Inc. (“Varney Bros.”), a closely-held corporation, against the corporation and its directors and officers, the plaintiff seeks attorneys *261 fees and costs of suit. This action involves claims, individually and derivatively, that the president of the corporation, Linda Varney, with the complicity of the directors and officers, was engaged in self-dealing in several respects, and took actions that were detrimental to the corporation and to Ellis’s interest as a shareholder. She alleged that the officers and directors breached their fiduciary duties to her as a minority shareholder, by denying her the benefits of her ownership interest and have frozen her out of the conduct of the affairs of the business. Her derivative shareholder action was brought on behalf of the corporation to recover amounts diverted because of self-interest and to recover the value of her ownership and/or the value of her proportionate share of increased profit to which she would have been entitled to receive as dividends on account of profit distributions in which she, and other shareholders should, but do not regularly receive. She also brought direct claims for conversion or unlawful interference with her right to receive shares of stock in two trusts. Ellis also sought an accounting, a rescission of the written employment agreement between the corporation and Linda, and a rescission of an amendment to the corporate by-laws regarding a restriction on the transfer of shares that gives a right of first refusal to the corporation and its other shareholders. Among other equitable orders which the plaintiff also requested were to require the corporation to establish a dividend payment policy and to have the directors replaced by persons independent of the Varney family.
This matter was tried, without jury, over the course of fifteen days between March 3, to March 25, 2003. The parties were granted leave until April 3, 2003, to prepare their final arguments and until April 15,2003, to file requests for findings of fact and rulings of law. The decision of the court was entered on January 9, 2004, finding in the plaintiffs favor with respect to a portion of the derivative claims, only [17 Mass. L. Rptr. 394]. 
Following receipt of the court’s decision, the parties filed various pleadings in connection with the plaintiffs prayer for attorneys fees and costs, to which the defendants are opposed for a number of reasons. The matter was considered on a non-evidentiary basis, with a hearing conducted on January 27, 2005; the matter was then taken under advisement.
DISCUSSION
A. Applicable Standards
As a “general principle,... a litigant must bear [her] own expenses, except so far as [her] burden is mitigated by a statute awarding [her] taxable costs . . . Besides a statutory exception applicable to cases originating in a Probate Court, that general principle is subject to a number of exceptions in equity practice . . . Where a litigant at his own expense has been successful in creating, preserving, protecting or increasing a fund in which others have a right to share, the court having control of that fund may order payment of counsel fees or costs as between solicitor and client out of the fund, upon the petition of the litigant or in some jurisdictions upon the petition of his attorneys, or the court may make the right of others to share in the fund conditional upon their contributing proportionately to the expenses of the litigation.” [internal citations omitted.] Commissioner of Insurance v. Massachusetts Acc. Co., 318 Mass. 238, 242 (1945). See also Bournewood Hospital, Inc. v. Massachusetts Commission against Discrimination, 371 Mass. 303, 308 (1976).
This category of case has generally been viewed to include successful minority shareholders in derivative actions.[2] The reason for such inclusion is similar: “an expense incurred by one, resulting in the creation of a fund for the general benefit of many other persons, ought not to be borne entirely by the one whose action has resulted in the realization of such a fund, and that it is equitable that a part of the expense should be paid out of the fund.” Shaw v. Harding, 306 Mass. 441, 450 (1940). But it has also been noted that “the allowance of counsel fees ‘is a matter which easily may become subject to abuse. It commonly rests in sound judicial discretion.’ ” Sarnia v. Central Oil Co. of Worcester, 339 Mass. 101, 129 (1959), citing Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass. 434, 441 (1935).
In the case of Hayden v. Hayden, 326 Mass. 587 (1950), cited by the Sarnia court as one of several references for standards appropriate for analogous cases, the court distinguished such applications from the voluntary contractual relationship, saying that when “payments are to be made out of the property of litigants to or for the benefit of counsel who may not have been employed by those whose estates are thus diminished, the standard is not the same as that applied in an action by an attorney against a client with whom he has voluntary contractual relations . .. A test commonly employed is the compensation paid to public officers for services of a similar character ... Fees in such cases are awarded on ‘strictly conservative principles.’ . . . That principle has been applied where counsel fees have been awarded by the court under G.L.c. 215, §45, and under its general equity powers, and we think it should be applicable to a case like the present where the payment of counsel fees is a forced one and is made to one with whom the [plaintiff] did not voluntarily contract. The power to award counsel fees in cases of this sort is one of great delicacy and is to be applied with caution.” Id. at 596. Although the plaintiff disagrees and suggests the court should adopt a more liberal view, in a case she cites in support of an ancillary point, the court in Robbins v. Robbins, 19 Mass.App.Ct. 538 (1985), repeated its “traditional invocation of a ‘conservative’ approach when it comes to charging counsel fees to a party who has in no way consented.” Id. at 543.
*262 Among factors suggested by the authorities that are to be included in a conservative approach are whether there was a likelihood of “substantial and needless duplication of effort as between the two counsel,” and whether there has been “substantial expenditure of time which could be attributed to extreme circumspection and zeal for completeness of preparation running beyond the requirements of the case.” Robbins, supra, at 541.
The court, in Robbins, supra, referred to “the factors that ought to enter into the judicial setting of counsel fees” as “numerous, complex variables” suggesting reference to cases including Cummings v. National Shawmut Bank, 284 Mass. 563 (1933). There, it was noted that “many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the properly affected by controversy, and the results secured. Neither the time spent nor any other single factor is necessarily decisive of what is to be considered as a fair and reasonable charge for such services.” Id. at 569. “It is true that not in all assessments of counsel fees need hours and rates be regarded as the ‘touchstone.’ ” Robbins v. Robbins, supra, at 542 [citing First National Bank of Boston v. Brink, 372 Mass. 257,267 (1977)]. “The most important, but not dispositive, factor in deciding whether counsel fees should be awarded at all is whether the plaintiffs have benefitted the corporation in some way by the result obtained in the lawsuit.” Dynan v. Fritz, 400 Mass. 230, 247 (1987). However, the plaintiffs own conduct is not immune from scrutiny, as it was noted in Smith v. Atlantic Properties, Inc., 12 Mass.App.Ct. 201 (1981), that the trial judge “could properly give weight to the portions of the evidence suggesting that the plaintiffs may have been in some measure responsible for the intensity of the bad feeling among the stockholders.” Id. at 211-12.
B. The Plaintiffs Application for Counsel Fees
The plaintiff has the burden to prove that the amounts sought to be paid by the defendant[3] are reasonable. Robbins v. Robbins, supra, at 541. This involves, as a general matter, a need to prove the number of hours that were reasonably necessary in pursuit of the successful claims and the fair market value of those hours, i.e., the hourly rate that can be charged. The plaintiff has filed an affidavit of counsel to which he has attached redacted invoices[4] for services rendered by counsel to the plaintiff supportive of her claim for counsel fees which she contends are necessarily related to that portion of the derivative claim in which she was successful, and reasonable in amount. The plaintiffs fee application, supported by those invoices, total an amount of $230,574.50.[5]
The defendants oppose the imposition of counsel fees on several grounds, among which is that the plaintiff has failed to satisfy her burden of proof to show that the hours alleged to be related to the successful portion of the case were reasonable in amount and that the hourly rate charged by counsel was reasonable. In addition to pointing to the failure of plaintiffs counsel to provide evidence of their billing relationships with other clients, the average billing rates in this area for this type of litigation and evidence of the litigation experience of plaintiffs counsel and their justification for charging their rates, specific grounds of the objection of the defendants to the information that counsel for the plaintiff did provide fall generally into five basic categories:
(1) that counsel have failed to keep or supply sufficiently detailed time records that relate time spent to the particular type of claim brought, and that the time entries are overly broad, vague and insufficiently detailed, referred to as “block billing”;[6]
(2) that the tasks and services rendered have been billed at excessively high rates;
(3) that the amounts of time that have been billed for certain activities were excessively high;
(4) that fees sought were not related to successful derivative claims; and
(5) lastly, the defendants contend that the plaintiff should not be awarded any fees due to the fact that the suit did not benefit the corporation and that the suit was brought for solely personal reasons: that it was in reality a freeze-out claim, brought with an intention to force a buy-out of her interest, and/or that it was initiated and/or pursued as a result of an agreement between the plaintiff and her husband which settled their divorce.
In evaluating the plaintiffs claim for fees, certain common themes emerge. For simplicity of discussion, the first three points are grouped into one general area, referred to below as claims of vagueness and excessiveness, and the remaining points, referred to as personal claims and interest, into another.
a. Vagueness and Excessiveness
Insufficiently detailed time records is an overarching theme in the defendants’ objections. Upon examination, the court finds that the invoices are largely block-billed, with many individual entries having been made in blocks of time of 4 hours or more, relating to vaguely described services without further itemization of time within the block for each item of service within each block of time in some, and with only a single item referenced as consuming such amounts of time in others. Indeed, after analyzing the invoices submitted, and for the sake of expediency and example, focusing upon just those blocks of time that were billed in excess of 4 hours in length, the invoices show that Atty. Mullady submitted 48 separate entries that relate to blocks of time of more than 4 hours, consisting *263 of 20 entries with blocks of time between 4 to 8 hours in length, 18 individual entries that show blocks of time of 9 to 12 hours in length, and 10 entries showing blocks of 13 hours or more. Atty. Raphaelson, who was clearly the more involved of the two attorneys in this case, had made 134 separate entries showing time in blocks in excess of 4 hours each, consisting of 90 entries from 4 hours to 8 hours in length, 32 entries showing blocks of time billed between 9 and 12 hours in length each, and 12 entries in excess of 113 hours, including one showing a 24-hour block.
While claims for counsel fees need not be measured against standards typically imposed by large, institutional and experienced consumers of legal services, such as insurance companies, who often require their outside counsel to bill for legal services in segments of fifteen minutes or less, and many such clients requiring bills to reflect segments of a tenth of an hour, I find that block-billing, certainly as regards segments of time in excess of four hours or more, and likely less, to be commercially unreasonable, as it is bound to lead to uncertainty at least, and a likelihood of inaccuracies, such as by exaggeration of absolute time spent, by failing to deduct for the occurrence of non-billable events within the time, by failing to itemize time spent on individual functions, and to have failed to itemize the amount of particular time spent towards particular claims.[7]
As regards the defense claims that the plaintiffs attorneys billed at excessive rates for services rendered, the defendants first take some issue with the rates charged, per se, by the two attorneys who appeared and represented the plaintiff, contending, inter alia, that counsel for the plaintiff has failed to satisfy the burden to prove that they are entitled to the rates at which they billed, providing no evidence of their billing of other clients and providing no evidence of hourly rates for attorneys of similar experience in the same market in which they practice. While counsel for the plaintiff have indeed failed to provide any documentation to support their hourly rates, I do not find their rates, ranging from a rate of $150.00 per hour in 1998, to $250.00 per hour in 2003, to be unreasonable, given their level of experience as shown during the trial and my understanding of the range of hourly rates charged by trial attorneys in this area who specialize in business litigation.
The defendants take greater exception to the fact that many events listed in the invoices could have, and therefore should have been conducted by other legal staff, i.e., junior associate attorneys or paralegal assistants, at a rate less than that of a senior trial attorney. There is certainly evidence within the invoices of plaintiffs counsel, of many events than can have been accomplished at a level of service less than that of a senior trial attorney, such as the many hours devoted to document review and the digesting of depositions. While in an ideal world, with access to unlimited funds, it may be beneficial to the overall success of a trial matter for senior trial counsel to conduct every event and to examine every page of discovery, under “strict conservative principles,” it is unrealistic, unreasonable and excessive to do so.
This was, as the defendants concede, a major piece of litigation that was made more complicated by personal, direct claims of the plaintiff. It also was hard-fought at practically every turn, resulting at one point in reference to a discovery master. The portions of the derivative case on which the plaintiff was successful, however, related more simply to an accounting of Linda Varney’s drawing account, and an evaluation of her employment contract and how it came into being in the context of the evolution of the management of the company and her place within it.
Overall, the invoices submitted by counsel for the plaintiffs, notwithstanding that they have already been redacted by counsel, show a total number of hours in excess of 1600, with more than 1100 hours having been billed by Attorney Raphaelson and in excess of 500 hours by Attorney Mullady. After arguments were made on March 3, 2003, in connection with motions in limine, evidence was taken over the course of 14 days thereafter, until March 25th, and with summations being given on April 3rd. Trial days consisted, for the most part, of half-days, each four hours in length. From the beginning of trial, on March 3rd, to the end of evidence, on March 25th, Attorney Raphaelson billed approximately 260 hours, averaging approximately 13 hours per day, for 6 days per week, for three and one-half weeks. During the same period of time, Atty. Mullady’s time records show 252 hours of work. In the invoices submitted related to the 13 days of work prior to the commencement of trial, from February 12, to March 2, Atty. Raphaelson submitted invoices that totaled 122 hours billed, and with Atty. Mullady billing for 70 hours. From March 26th to April 15th, a period of time that included preparation for final argument, and of proposed findings of fact and rulings of law, Atty. Raphaelson submitted invoices that show approximately 127 hours of work and Atty. Mullady’s invoiced time for this same period totals almost 79 hours. When these periods of time, from February 12th to April 15th are considered together, the records show that Atty. Raphaelson submitted invoices for almost 510 hours and Attorney Mullady, 400 hours. While the court does not intend to be critical of a striving towards perfection, it is unreasonable to require an opposing party to be responsible for its payment. As was noted in the Robbins case, supra, “we do not intend to detract in any way from the good work done by conscientious, diligent and effective counsel, nor do we intimate that counsel are advancing their claim otherwise than in good faith. But our inquiiy must go deeper.” Id. at 540.
The defendants also claim that excessive time was spent on many given items. From the invoices of plaintiffs counsel, the defendants have catalogued a *264 number of examples of unreasonably excessive amounts of time having been spent on various aspects of the case, without regard to whether the time was spent on successful or unsuccessful claims. For example, in excess of 46 hours, and possibly as much as 69 hours were spent in preparation of motions for summary judgment and for a preliminary injunction, 24 hours spent in preparation for argument on those motions, and 7.5 hours spent by counsel on the day of the argument itself. Another example is that 370 hours appear to have been spent to prepare for trial, including 37 hours to prepare for an opening statement, for which counsel could not expect to be allowed more than fifteen minutes by court rule, unless leave to exceed that time was granted, and 66 hours of time was billed in preparation for the examination of Linda Varney, who was certainly a central figure in the case, and who already had been deposed over the course of 3 days, at a preparation cost of at least 37 hours. In addition, more than 100 hours was taken to prepare final requests for findings of fact and rulings of law. This certainly is persuasive evidence, and the court so finds, that there has been “substantial expenditure of time which could be attributed to extreme circumspection and zeal for completeness of preparation running beyond the requirements of the case.” Robbins, supra, at 541.
Counsel for the defendants have correctly predicted that the court, when faced with the type of fee application having been submitted here, will have to adopt some form óf a “rough and ready” approach in its examination. Given the numerous examples of block-billing, vagueness and excessiveness in the preparation of various aspects of this case, and in seeking to apply the appropriate standards as governed by “strict conservative principles,” the court deems it reasonable and proper to reduce the plaintiffs fee application by a factor of one-third, resulting in a preliminary fee award in the amount of $252,561.67.[8]
b. Personal Claims and Interests
The defendants complain that the plaintiffs legal fees are largely not related to successful derivative claims, that tire plaintiff has failed to adequately document how the invoiced services relate to successful claims and that the plaintiff should not obtain the benefit of corporate funds to reimburse her for counsel fees given her personal interests that were represented by and influenced the case.
The portion of the plaintiffs case in which she was successful relates to a bonus provision in Linda Varney’s employment contract which had been treated by the corporation to include income from the sale of company assets, namely real estate, and an overpayment to Linda Varney in a drawing account in the amount of $100,000.00. When expressed in actual dollar amount, this has a direct impact upon the corporation and Linda Varney as it voids a payment otherwise due her of approximately $485,000.00, and requires her in addition to repay the corporation in excess of $100,000.00, the case involved far more than simply these two items. As already noted, the plaintiffs complaint included many allegations, some of which related to derivative claims for which she was not successful and some related solely to personal or direct claims. Among these were claims by which the plaintiff sought orders to:
(1) void Linda Varney’s employment contract, in toto, from the beginning, and to require a repayment by her of everything she received pursuant to the agreement;
(2) require a repayment of a 1987 salary payment of $150,000.00;
(3) require repayment of two checks in the amount of $10,000.00 each that were given to two daughters from a prior marriage;
(4) require rescission of a 1987 land transaction for which she received $150,000.00 from the corporation;
(5) avoid other land transactions into which the corporation had entered;
(6) avoid a corporate by-law which restricted the transferability of shares;[9]
(7) require a guarantee, in effect, from the directors for their overpayment of Linda Varney;
(8) require removal of all directors and their replacement by others independent of the Varney family;
(9) require the board institute a dividend policy;
(10) conversion claims made directly or indirectly against Linda Varney regarding shares of stock held by trustees of Varney trusts;
(11) require the corporation to redeem her shares at market value.
Plaintiffs counsel represents that those entries that they believe to relate to matters on which the plaintiff was not successful have been removed from the invoices of counsel fees, and have also reduced the amount of time devoted to final trial preparation, trial and post-trial activities by a factor of 50%, chosen by counsel to represent, in their opinion, the percentage that the successful derivative claims bore to the entire case. Given the large quantity of block-billed items, and notwithstanding counsel’s willingness to discount more than half of the entries by 50%, the court does not credit that the invoices will have been sufficiently redacted of entries that relate to efforts towards non-successful claims and infers that the invoices still contain substantial entries that do not relate to successful claims. While the court is mindful of the fact that counsel’s efforts in connection with the trial of some of the claims, especially as regards the bonus provision upon which she was successful, might not be readily distinguishable from others that relate to Linda Varney’s employment contract, for example, given the conservative standards that apply, if the plaintiff expects the defendant corporation to be responsible for payment of her counsel fees, it is *265 entitled to expect greater discernment in the invoices. Moreover, while the court may agree that a major focus of the plaintiffs case was an attack upon Linda Varney’s employment contract, of which the bonus was a significant part, it was not the only aspect of her contract with which the plaintiff took issue, noting that a serious attack was mounted in connection with the amount of salary she received and the ten-year term of the contract, viewed in connection with other companies in related industries and when viewed in terms of her performance. These issues were fought within the greater context of a seriously-contested theory of the plaintiffs case that the contract should be rescinded in total, due to breaches by Linda Varney as an officer and director, and the other directors of their fiduciary duties owed to the plaintiff in connection with an alleged abdication or failure to negotiate contract terms that would fairly represent the interests of the corporation and its shareholders, as well as a hard-fought battle over whether the entire board of directors ought to be removed and replaced by directors independent of the Varney family on the ground that the existing officers and directors cannot be trusted to respect and safeguard the plaintiffs interests.
Additionally, the defendants complain that this case was not brought nor ever intended to benefit the corporation but was rather motivated solely for personal reasons, such as to force a buy-out of the plaintiffs ownership interest. The plaintiffs amended complaint begins: “(t]his is a classic case of freeze-out and breach of fiduciary duty in the context of a closed corporation ...” It ends with a listing of her prayers for relief, one of which is to “award damages to Jane for the fair value of her stock in the Company, and for the fair value of any other assets held by the Milford [National Bank & Trust Company] to which Jane has a present entitlement.”
The defendants also contend that the litigation was brought and/or pursued for other purposes, such as to satisfy an agreement between the plaintiff and her ex-husband settling their divorce, and in particular, the requirement that the plaintiff zealously prosecute the within case and to consult with the ex-husband in connection with any proposed settlement of the case. That agreement, filed as an attachment to the Supplemental Submission with respect to Attorneys Fees, of Varney Bros., states in relevant part: “[t]he wife [Jane Ellis] shall have an affirmative obligation to maintain the Varney Brothers Sand & Gravel, Inc. litigation and to pursue the litigation with zeal. The wife’s attorney in the Varney Brothers Sand & Gravel, Inc. shall provide all settlement documents to the husband. If required, the husband agrees to enter into a confidentiality agreement for any documents received. The wife’s attorney shall provide ongoing status information with releasable documents to the husband while the litigation is pending.”
The divorce was filed by Jane Ellis’s husband Richard Ellis during 1997, and culminated, by the entry of a decree nisi on June 7, 1999, incorporating the separation agreement of which the above clause, referring to the litigation, was made a part. This litigation was filed on June 17, 1998. It appears that this clause was not known to the defendants until Jane Ellis testified in the instant case. According to the defendants, they had not been allowed to examine the divorce file concerning the plaintiff and her ex-husband in the probate court as it had been impounded since 1998, and the impound order not lifted until after this court’s decision in the instant case was filed, during the pendency of proceedings concerning this fee application. I have examined the history of this case, at least as is represented in the court file, and had some pre-trial exposure to the intensify of feeling between the parties, having had responsibility to act upon the findings and recommendations of the discovery master appointed by another member of the court. I also presided over the trial of this case, which was three and one-half weeks in length, and often contentious, wherein a depth of emotional response to the issues involved was often just barely beneath the surface.[10] While I do not lay blame on one side or the other, finding sufficient cause to believe that both sides of the case were deeply invested in and concerned about their respective positions, I find sufficient evidence that the existence of this divorce agreement and, in particular, the terms in the agreement that referenced this litigation to have contributed to the zealousness of the prosecution of the case and the creation of an atmosphere and an attitude in which agreement over issues, large and small, was unlikely. Indeed, the Joint Pre-trial Conference Memorandum, signed by counsel for all parties, exemplifies this atmosphere: it begins, in Section I — Agreed Facts, “The parties have been unable to reach agreement on any facts to be submitted in the form of an exhibit at trial.” Moreover, this agreement represents credible evidence of the direct and personal interest of the plaintiff and her ex-husband in the outcome of this litigation, as the divorce agreement also contains provision that a portion of proceeds from the litigation that the plaintiff mayrecover, less expenses, shall be placed in trust funds for their children, that her ex-husband reserved a right to terminate alimony and to require the plaintiff to refinance the mortgage or remove the ex-husband from liability thereon upon the plaintiffs receipt of $100,000.00 or more in net proceeds, and to recalculate child support based upon any recovery of proceeds. (See Separation Agreement, Exh. B, attached thereto, numbered p. 8, 10-11.)
This court finds that this litigation involved the personal interests of the plaintiff, represented by her direct claims and her divorce agreement with her ex-husband, and derivative claims in which she was not successful to the same extent, at the least, as it involved the corporate interests of the defendants represented by the derivative claims in which the plaintiff was successful. It is also fair to impose upon the plaintiff, as a one-third shareholder, a burden to share in the fees and costs of *266 the suit, as the decisional law under which this analysis is made has not held that all of the burden of counsel fees in a derivative shareholder suit should be borne by the corporation, since the minority shareholder may obtain some benefit in the fund created by the litigation. “An expense incurred by one, resulting in the creation of a fund for the general benefit of many other persons, ought not to be borne entirely by the one whose action has resulted in the realization of such a fund, and that it is equitable that a part of the expense should be paid out of the fund.” Shaw v. Harding, 306 Mass. 441, 450 (1940). [Emphasis added.) Consequently, for all of the foregoing reasons, the fee application of the plaintiff shall be further reduced by an additional factor of one-third. This results in a fee award in the amount of $126,280.83.[11]
C. Costs
As previously noted, the plaintiff seeks an order that requires the defendant corporation to pay $56,228.20 in costs, consisting of the expenses incurred related to depositions of the parties, expert witnesses and hotel and meals expenses of counsel during trial. These costs consist of the following:
(1) deposition costs of the defendants Linda Varney, Barbara Jerrier, Bartholomew Molloy and Jon Var-ney, all of whom are officers and directors of Varney Bros. Sand & Gravel, Inc., and of the plaintiff Jane Ellis, in the amount of $6313.95;
(2) expert witness expenses of:
(a) Edward Mruk ($30,728.00);
(b) Stowe & Degon ($15,825.00);
(3) hotel and meals expenses of plaintiffs counsel during trial, in the amount of $3032.85;
(4) copy charges of $328.40.
For the reasons expressed by the defendant in its opposition to the fee application of the plaintiff, at pp. 16-17, the amount of fee that the defendant is ordered to pay the plaintiff on account of services rendered by William Stowe is $5000.00. In all other respects, the costs are approved as applied, for a total of $46,228.40.
ORDER ON APPLICATION FOR AWARD OF FEES AND COSTS
For the foregoing reasons, an award of counsel fees and costs shall be entered in favor of the plaintiff which orders Varney Bros. Sand & Gravel, Inc., to pay legal fees in the amount of $126,280.83, and costs in the amount of $46,228.40.

The plaintiff rightly concedes that she would have no right to the imposition of fees and costs related to her direct claims. See Dynan v. Fritz, 400 Mass. 230 (1987), fn. 26. That includes a “freeze-out” case. Sugarman v. Sugamvm, 797 F.2d 3 (1st Cir. 1986).

This fee application is directed against the corporate defendant, and while several of the defendants oppose the application, all references herein to defendant liability for such fees is limited to Varney Bros. Sand & Gravel, Inc.

Rather than attach their entire billing history as submitted to the plaintiff for payment, the fee application by plaintiffs counsel represents that those entries that are believed to relate to matters on which the plaintiff was not successful have been deleted from the invoices of counsel submitted herein. Therefore, among other issues, the invoices attached do not permit the court to evaluate the relationship of the fees to which reimbursement is sought to the entire amount billed to the plaintiff for counsels’ work on the case.

Counsel for the plaintiff has stated, in recognition of the fact that the plaintiff was not successful on all of her claims, that he has reduced by 50%, the amount of time devoted to final trial preparation, trial and post-trial pleadings, including time for preparation of the instant fee claim (with the reduction first seen to apply with the entry of July 29, 2002, the point at which their hourly rate changed from $200.00 per hour to $225.00). The plaintiff contends that she is entitled to such reimbursement for these fees as reduced, and for all fees, without reduction, for services prior to these final stages, since their successful attack of the bonus provision in Linda Varney’s employment agreement was the real centerpiece of the entire claim and their efforts. Counsel has also filed invoices in support of a claim for costs of suit alleged to be related to the successful derivative claims, in the amount of $56,228.20, which shall be discussed infra.

“Block billing,” as that term is intended and used by the court, refers to either a large number of distinct events that are grouped together without distinction as to time within a single, large block of time, or a single, large block of time containing a single event, vaguely or oversimply described, e.g., “research,” “trial preparation,” “conference” or “document review,” to name a few.

Indeed, the plaintiffs fee application refers to “consideration” of counsel to “their recollection of the time that they committed to the various aspects of the case,” from which I draw an inference that counsel recognized that there was a need to supplement by memory whatever billing records that were prepared contemporaneously by plaintiffs counsel. See the plaintiffs Reply to Varney Bros. Objection to her Request for an Award of Fees and Expenses, at p. 4.

In examining the actual invoices submitted, I find that the amount billed the plaintiff for legal services rendered by her attorneys total $378,842.50, well in excess of the fees claimed. In light of the findings, rulings and decision of the court to order a reduction in the amount of fees on a percentage basis on two separate and distinct grounds, rather than by a reduction of particular hours or tasks, in order to avoid duplication of a reduction for the same reason as the plaintiff may have already done, the gross amount of the invoices served as the starting point, rather than the fee application amount as already reduced by the 50% reduction.

N'his claim for relief was part of the active complaint, and although not a subject of evidence or argument during trial, and ultimately waived in open court at the time of final arguments, remained a live issue up to the time of trial.

Indeed, the plaintiff herself exhibited an emotional reaction when revealing the particular clause in question during her testimony.

 Even when this amount is viewed independent of the reasons previously stated, it is deemed to be a fair and reasonable amount when measured against the amount of funds made available to the corporation as a direct result of this litigation, especially when reduced by potential distribution(s) to the plaintiff in the form of dividends made possible by the litigation and for which the plaintiff should bear some of the expense.