A.W. CHESTERTON COMPANY, INC.,
James D. Chesterton, Thomas Chesterton, Jr., Andrew W. Chesterton, Glenn E.
Chesterton, Florence Chesterton, Boston
Safe Deposit, Inc., Trustee of the Thomas Chesterton Trust, and Adele Forman,
Plaintiffs, Appellees,

v.

Arthur W. CHESTERTON,
Defendants, Appellant.

No. 97–1268.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1997.

Decided Oct. 14, 1997.

Martin F. Gaynor, with whom Harry L. Manion III was on brief, for plaintiffs, appellees.

Lawrence P. Heffernan, with whom Michael D. Lurie and Peter L. Banis were on brief, for defendants, appellant.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

This appeal involves the duties imposed by Massachusetts law on a minority shareholder in a closely held corporation. Arthur W. Chesterton ("Chesterton"), a minority shareholder in the A.W. Chesterton Company, frustrated in his efforts to dispose of his shares, proposed to transfer a portion of his stock in the Company to two shell corporations. Because such a transfer would terminate the Company's advantageous Subchapter S status under the Internal Revenue Code, the district court found that the proposed transfer violated Chesterton's fiduciary duty to the Company and enjoined him from proceeding with the transfer. Chesterton appeals this finding and injunction, as well as the district court's denial of Chesterton's counterclaim for relief under M.G.L. ch. 156B. We affirm.

I.

There is little dispute about the facts which emerged from the trial. While it is unclear whether Chesterton is asserting that the district court's factual conclusions are not supported by the evidence, we state the facts as the court could have found them. *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 756 (1st Cir.1996).

The Company has been a closely held Massachusetts corporation since its inception in 1885, and is currently owned and operated by the descendants of the Company's founder, Arthur W. Chesterton. Chesterton, the defendant in this case and the grandson of the original Arthur Chesterton, is currently the Company's largest shareholder, with 27.06% of the Company's stock. The Company and its affiliates manufacture mechanical seals, packaging, pumps and related products, which are distributed throughout the world.

Two corporate events set the stage. The first occurred in 1975, when the shareholders of the Company approved the Company's Restated Articles of Organization ("the Articles"). The Articles provide the Company with a right of first refusal in the event that a shareholder seeks to transfer her shares to an individual or entity outside the immediate Chesterton family. The shareholder must give the Company 30 days notice; the Company may avoid the sale by opting to purchase the stock within the 30 days. If the Company declines the option, the shareholder may proceed with the sale as planned. Part of Chesterton's argument focuses on the fact that he had complied with these provisions of the Articles when he proposed his stock transfer.

The second occurred in 1985, when the Company's Board of Directors voted to change the Company's status under the Internal Revenue Code from a Subchapter C corporation to a Subchapter S corporation. The Board perceived Subchapter S status as advantageous to the Company because it allows shareholders in a small business corporation to avoid the double taxation of income to which shareholders in a Subchapter C corporation are subject. The income of a Subchapter C corporation is taxed first at the corporate level when the company earns income, and a second time at the shareholder level when the shareholders receive the income in the form of dividends. A Subchapter S corporation, in contrast, is not taxed at the corporate level; rather, each shareholder pays income tax individually in proportion to her share of ownership in the corporation.[1] *See* 26 U.S.C. §§ 1361–1399.

In order to qualify for Subchapter S treatment, a corporation must be a domestic corporation which does not: (1) have more than seventy-five shareholders, (2) have a corporation or other non-individual as a shareholder, (3) have a non-resident alien as a shareholder, and (4) have more than one class of stock. 26 U.S.C. § 1361(b). Failure to abide by any of these limitations results in automatic termination of Subchapter S status. 26 U.S.C. § 1362(d)(2).

After the Company Board voted to adopt Subchapter S status, the officers and di-

---

1. There is a drawback to Subchapter S status known as "phantom income." That phrase describes the liability that shareholders in an S corporation face for taxes on their share of the corporation's profits, even if those profits are not distributed to the shareholders as dividends. Chesterton makes much of the fact that the Company's shareholders are subject to the risk of phantom income, but offered no evidence that the risk had materialized.

rectors sought to inform the shareholders about the benefits and limitations of the S election, and recommended that the shareholders give their consent. Under the Internal Revenue Code, the unanimous consent of the shareholders of a corporation is required in order to finalize a Subchapter S election. 26 U.S.C. 1362(a)(2). As an officer and director of the Company at the time, Chesterton was heavily involved in this process. He led and participated in shareholder meetings regarding the Subchapter S election. At those meetings the shareholders were provided with information regarding the benefits of Subchapter S election, as well as the limitations it imposed. The shareholders unanimously consented to the Subchapter S election. Implicit in this consent was a general understanding among the shareholders that they would take no action that would adversely affect the Company's Subchapter S status.

In the early 1990's, Chesterton became discontented with the Company's performance, including its declining profits, heavy debt, and credit problems.[2] Chesterton also objects to a financial arrangement that the Company has with Chesterton International, B.V. ("BV"), a Company affiliate.[3] Under the arrangement, the affiliate BV pays the Company a large management fee,[4] which has allowed the Company to continue to pay dividends to its shareholders, despite its poor financial performance. Chesterton believes that this arrangement masks the Company's dire financial straights. He also objects to the arrangement because much of the management fee is funnelled into Company pension plans, from which Chesterton does not benefit because he is not a current Company employee.

Because of his dissatisfaction with the Company, Chesterton sought to sell his Company stock. He found little interest because all he could offer was a minority of shares.[5] After some failed efforts to locate an investor willing to purchase his stock outright, Chesterton devised the scheme at issue in this case. Chesterton proposed to transfer a portion of his shares to two shell corporations which are wholly-owned by him. Chesterton complied with the Articles of Organization by providing the Company with the proper notice of his proposed transfer so that it could purchase his shares. The Company, however, declined because it lacks the ability to purchase the shares.

When the Company would not purchase his shares, Chesterton sought to proceed with the transfer. But that transfer would have a deleterious effect on the Company's tax status. The Company and its shareholders derive significant tax benefits from the Company's status as a Subchapter S corporation. Should a corporation become a Company shareholder, as it would under Chesterton's proposed transfer, the Subchapter S status terminates automatically. 26 U.S.C. § 1362(d)(2). If Chesterton were to consummate his proposed transfer to the shell corporations, the Company would revert to Subchapter C status. The Company's Subchapter S status enabled it to distribute an additional $5.3 million in dividends between 1985 and 1995. Reversion to Subchapter C status would represent a significant financial loss for the Company and its shareholders. Once a corporation loses its Subchapter S status, it cannot reattain that status for a minimum of five years. 26 U.S.C. 1362(g). In fact, loss of Subchapter S status would have a more severe effect on the Company because it is currently grandfathered under an old provision which exempted Subchapter

2. Chesterton points to testimony which showed that the Company currently has $16,000,000 in outstanding debt, that it has violated its loan agreements, and that in 1994 the Company needed to borrow money to pay dividends.

3. The affiliate BV is owned and operated by the same shareholders and Board of Directors as the Company.

4. Chesterton asserts that this management fee does not actually reflect the value of services

provided to the BV by the Company. He argues that because the Internal Revenue Service could reclassify the excess of the fee over the value of the services as dividends to the BV shareholders, this incongruity exposes the shareholders to increased tax liability.

5. None of Chesterton's fellow shareholders were willing to sell their stock and join him to offer a majority package.

S corporations from taxes on the sale of corporate assets. *See* 26 U.S.C. § 1374(c)(1). Even if the Company eventually regained its Subchapter S status, it would permanently lose its grandfathered status.

Fearing the loss of its Subchapter S status, the Company and its shareholders instituted suit, seeking to enjoin Chesterton from effectuating his plan. The original complaint alleged breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, and interference with an advantageous relationship. Before trial, the parties stipulated to a dismissal of all claims, with prejudice, except for the breach of fiduciary duty claim. Plaintiffs also agreed to "waive their claims for damages, but [not] their claims for equitable relief." After a bench trial, the district court ruled that the proposed transfers would violate Chesterton's fiduciary duty under Massachusetts law and that they would result in irreparable harm to the Company. The court enjoined the transfers and denied Chesterton's counterclaim for monetary relief under Mass. Gen. Laws ch. 156B.

Chesterton argues that the district court improperly determined the scope of Chesterton's fiduciary duty under Massachusetts law. He asserts that the district court improperly resurrected the waived contract claim by discussing the general agreement among the shareholders not to disrupt the Company's Subchapter S status. He argues that the district court improperly concluded that the Subchapter S election imposed an implied restriction on transferability of stock, where the Company did not follow the legal requirements for imposing stock transfer restrictions under Mass. Gen. Laws ch. 156B. Finally, he argues that the district court improperly restricted Chesterton's presentation of evidence at trial concerning certain Company accounting practices. We reject Chesterton's arguments.

## II.

We review the district court's grant of a permanent injunction for abuse of discretion. *Narragansett Indian Tribe v. Narragansett Elec. Co.*, 89 F.3d 908, 912 (1st Cir.1996) (citing *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 754–55 (1st Cir.1990)). The standard for issuing a permanent injunction requires the district court to find that (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction. *Indian Motocycle Assoc. III Ltd. Partnership v. Massachusetts Housing Fin. Agency*, 66 F.3d 1246, 1249 (1st Cir.1995) (internal citation omitted). The district court found, and we agree, that the public interest was not at issue in this case. We turn to the remaining three factors.

### A. Success on the Merits

In *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), the Massachusetts Supreme Judicial Court first announced that shareholders in a closely held corporation owe an elevated fiduciary duty to one another. *See generally*, Peter M. Rosenblum, *Corporate Fiduciary Duties in Massachusetts and Delaware, in* How to Incorporate and Counsel a Business 331, 354–366 (Massachusetts Continuing Legal Education, Inc., ed., 1996) (providing an informative review of *Donahue* and its progeny). After noting that close corporations bear a "striking resemblance to a partnership," the court stated that "the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed." *Id.* 328 N.E.2d at 515. The court condemned "[d]isloyalty and self-seeking conduct on the part of any stockholder" in a close corporation, and held that such shareholders owe one another a duty of "utmost good faith and loyalty." *Id.* The court stated that stockholders in a close corporation "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* Although the *Donahue* case itself dealt with the majority's treatment of a minority shareholder, the court expressly did not limit the application of its strict fiduciary

duty standard to majority shareholders, and stated that "[i]n the close corporation, the minority may do equal damage through unscrupulous and improper 'sharp dealings' with an unsuspecting majority." *Id.* at n. 17 (citing *Helms v. Duckworth*, 249 F.2d 482 (D.C.Cir.1957)).

The first Massachusetts case to apply the *Donahue* standard to a minority shareholder was *Smith v. Atlantic Properties, Inc.*, 12 Mass.App.Ct. 201, 422 N.E.2d 798 (1981). In *Smith*, a provision in the corporate charter effectively gave minority shareholders the power to veto any distribution of dividends. Although all the other shareholders desired a distribution of dividends, the defendant steadfastly refused to agree to a distribution because nondistribution was personally beneficial to him. The appeals court held that the majority could seek protection from the actions of the minority shareholder which were detrimental to the interests of the corporation and the other shareholders. *Id.* 422 N.E.2d at 801. Although the court. recognized that the veto provision was drafted in part to protect minority interests, it nevertheless determined that a minority shareholder was bound to the *Donahue* standard of fiduciary responsibility when that shareholder's actions controlled the disposition of a particular corporate issue. *Id.* at 803 n. 9 (" 'A minority shareholder whose conduct is controlling on a particular issue should be bound by no different standard [than the majority].' ") (quoting Hetherington, *The Minority's Duty of Loyalty in Close Corporations*, 1972 Duke L.J. 921, 946).

The Supreme Judicial Court endorsed the *Smith* approach in *Zimmerman v. Bogoff*, 402 Mass. 650, 524 N.E.2d 849 (1988), holding a minority shareholder to the same standard of strict fiduciary duty as the majority, where the minority's self-interested actions were harmful to the corporation and other shareholders. *Id.* 524 N.E.2d at 853–54. The court made clear that "[t]he protections of *Donahue* are not limited to those with less than 50% share ownership." *Id.* at 853.

■ The *Donahue* family of cases establishes that Chesterton owes the Company and its other shareholders a fiduciary duty of "utmost good faith and loyalty." The district court did not abuse its discretion in finding that Chesterton breached that duty. If Chesterton were to effectuate his proposed transfer, the Company and its shareholders would lose the substantial financial benefits they have derived from the Company's Subchapter S status. Such benefits are likely to continue if the Company maintains its Subchapter S status. Chesterton, disgruntled with overall Company performance and in pursuit of his own self-interest, has threatened to destroy these substantial benefits. No claim is before us as to whether the Company and its other shareholders have acted fairly toward Chesterton over the years; we decide only that the district court did not abuse its discretion in holding that he has not acted fairly towards them.

■ Chesterton's attack focuses on part of the district court's analysis:

> At the time of the S election, the shareholders were informed and understood that the Company would lose its S status if a shareholder sold shares to another corporation. By unanimously electing S status, the shareholders agreed that they would not act in any way that would cause the Company to lose the considerable benefits of S status. . . . In view of the agreement regarding S status, which Defendant supported and facilitated, he cannot now sell his shares in a manner that would terminate the Company's S status, even though he would have been entitled to do so under the Articles had there been no S status agreement.

*A.W. Chesterton Co. v. Chesterton*, 951 F.Supp. 291, 295 (D.Mass.1997). Chesterton argues that this discussion improperly resurrects a contract claim that plaintiffs voluntarily dismissed. We disagree: in context it is clear that the court was discussing the shareholders' understanding as it relates to Chesterton's fiduciary duty. Under Massachusetts law, the expectations and understanding of the shareholders are relevant to a breach of fiduciary duty determination. *See, e.g., Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 664 (1976) (holding that the duty of utmost good faith and loyalty at a minimum requires shareholders to consider their actions in light

of company policies or long-standing understandings of the shareholders). Viewed in this context, it is irrelevant whether the agreement among the shareholders that they would not act so as to destroy the Company's Subchapter S status is legally enforceable. The existence of the agreement simply sheds light on the Company's and other shareholders' expectations, and reinforces the disloyal nature of Chesterton's proposed plan. Further, the strict duty Chesterton owes is created at law and would exist regardless of any agreement.

■ Chesterton also argues that he falls within an exception to *Donahue*. In *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 663 (1976), the Supreme Judicial Court fashioned an exception to *Donahue*, recognizing that "the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation." If "the controlling group can demonstrate a legitimate business purpose for its action," then it will not be held to have violated its fiduciary duty to the corporation and other shareholders. *Id.* The court held that the proffered legitimate business purpose defense would fail, however, if the complaining shareholder(s) could demonstrate that the same business objective could have been achieved through a less harmful course of action. *Id.*

Implicitly conceding that his proposed transfer would further his own personal interests but not the interests of the business, Chesterton argues that the legitimate business purpose test applies only to minority shareholders with management discretion or control over the corporation, and that he is not in such a position. Chesterton proposes the adoption of a less demanding test for non-managing minority shareholders that inquires whether the action is for a "bona fide purpose." Chesterton's bona fide purpose test, although creative, fails for a number of reasons.

■ First, Massachusetts law has not adopted any such rule. The Massachusetts cases make clear that a "legitimate business purpose" must be a legitimate purpose *for the corporation*, not for the defendant shareholder. In *Zimmerman* and *Smith*, for ex-

ample, the defendant minority shareholders acted to benefit their own interests, while disregarding the interests of the corporation. The fact that their actions were taken to benefit themselves was no excuse. The defendant in *Smith* argued that his use of the veto power to block the payment of dividends was at least partly due to his own legitimate purposes, specifically a "tax avoidance purpose." *Smith*, 422 N.E.2d at 800. Regardless of the *Smith* defendant's personal reasons for refusing to authorize the payment of dividends, the refusal nevertheless violated his duty of good faith and loyalty to the corporation's interests. *Id.* at 803. The Massachusetts cases do not provide any grounds for Chesterton's proposed test, and as a federal court ruling on Massachusetts law, we hesitate to expand that law beyond its clearly established boundaries. *See F.D.I.C. v. Insurance Co. of N. Am.*, 105 F.3d 778, 783 (1st Cir.1997) ("We must apply the law of Massachusetts as given by its state legislature and state court decisions.").

In addition, Chesterton's proposed expansion mistakes the purpose of the legitimate business purpose test. The test is designed to prevent "the *Donahue* remedy [from placing] a strait jacket on legitimate corporate activity." *Zimmerman*, 524 N.E.2d at 853. If the defendant has no control over the enterprise, he has no need for the business discretion that the *Wilkes* court intended to protect through its legitimate business purpose defense. Furthermore, as *Smith* and *Zimmerman* explain, a minority shareholder is held to the *Donahue* fiduciary duty precisely because his actions could and do affect the interests of the corporation and the other shareholders. Here, because Chesterton's actions will determine whether the Company retains its advantageous S status, he unquestionably has control over that issue.

Chesterton did not establish a legitimate business purpose for his proposed transfer at trial, and does not argue one on appeal. Indeed, if there was no market for Chesterton's shares because they were minority shares, there is little reason to think that there will suddenly be a market because those same minority shares have been transferred to corporate ownership. There is no

evidence of any such effect.[6] Further, Chesterton proposed to transfer only approximately 10% of his shares to the corporations, which hardly would have satisfied his articulated goal of complete divestment. The district court did not abuse its discretion.

### Chesterton's Chapter 156B argument

■ Chesterton argues that the only legitimate restrictions on the transferability of Company stock are those found in the 1975 Restated Articles of Organization and that he complied with the Articles' procedural requirements by providing the Company with the proper notice of his proposed transfer. This argument misses the point. If the strict *Donahue* fiduciary obligations did not restrict otherwise legitimate actions, they would add nothing to a shareholder's legal duties. *See, e.g., Smith,* 422 N.E.2d at 802 (minority shareholder breached his fiduciary duty to the corporation in exercising veto power over dividends that corporate charter gave him). Chesterton cannot defend a breach of fiduciary duty claim on the basis that he has not violated the Articles of Organization.

■ Chesterton also asserts that any transfer restriction beyond those incorporated in the 1975 Articles is invalid for failure to comply with the requirements of Mass. Gen. Laws ch. 156B. Chesterton refers to §§ 76, 77(d), and 87–98, which provide, *inter alia,* that a shareholder in a chapter 156B corporation is entitled to appraisal rights in the event that the corporation adopts any amendment to its articles which restrict the transferability of stock. Those sections also require that notice of the rights of dissenting shareholders be provided in the notice of any meeting at which the proposed transfer restrictions will be considered. Chesterton argues that the district court was precluded from finding that the 1985 Subchapter S election resulted in an implied restriction on the shareholders' ability to transfer their shares because the Company did not comply with Mass. Gen. Laws ch. 156B.

Again, Chesterton's argument is misguided. These provisions do not apply here.

The procedures and rights that Chesterton refers to apply in only three situations: (1) when the corporation makes certain amendments to the articles of organization; (2) when certain mergers are accomplished; and (3) when the corporation sells all or substantially all of its assets. Mass. Gen. Laws ch. 156B, §§ 76–77, 82–83, and 86–98. None of these situations exist in this case.

■ Chesterton argues that even if the 156B protective procedures do not technically apply to this situation, 156B reveals a strong public policy disfavoring any transfer restrictions in the absence of formal notice and appraisal rights. This argument fails for two reasons. First, Chesterton's strict fiduciary duty does not result in a complete transfer restriction. Chesterton was free to transfer his shares in a manner that would not terminate the Company's S status. Second, the public policy embodied in the *Donahue* doctrine is at least as strong as the policy disfavoring transfer restrictions.

We reject all of Chesterton's inventive arguments, and affirm the district court's finding that plaintiffs succeed on the merits of their breach of fiduciary duty claim.

### B. *Irreparable Harm*

■ The district court found that the Company would suffer irreparable harm from the loss of its Subchapter S status, in part because that harm is not measurable. Chesterton argues that because the harm to the Company from the loss of its Subchapter S status is entirely financial, equitable relief is inappropriate. Where the harm is not measurable, it is not an abuse of discretion to award equitable relief. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir.1996) ("If the plaintiff suffers a substantial injury that is not accurately measurable … irreparable harm is a natural sequel."). The loss of advantageous tax status can form the basis for a finding of irreparable harm. *See San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.,* 701 F.2d 1000, 1007 (1st Cir.1983) (relying on loss of advantageous tax status and other

---

**6.** Chesterton asserts that he had a potential buyer for an interest in his new corporations. That buyer was an old friend of Chesterton's and the district court found this rationale to be a sham.

findings to support a preliminary injunction). The district court found that the actual degree of the injury was not measurable, "because the amount of the increased tax liability would be contingent on the Company's future earnings and distributions." This finding is supported by the record and common sense, and is not an abuse of discretion.

Chesterton also argues that the Company would suffer no irreparable harm in the absence of the injunction, because the Company could have achieved a return equal to the Subchapter S status tax savings by redirecting the management fee that the BV pays to the Company. He argues that if the BV made distributions of its income directly to the shareholders, rather than to the Company through the management fee, the shareholders would receive substantial sums of money. In addition, he asserts that the management fee does not accurately measure the value of services provided by the Company to the BV, and that this disparity could result in an IRS reallocation of income, in turn resulting in substantially greater taxes to the shareholders. This argument, regardless of its accuracy, is irrelevant. The fact that the Company could achieve greater distributions for its shareholders by redirecting the management fee does not alter the fact that the loss of Subchapter S status is injurious in any event.

For the same reasons, we reject Chesterton's claim that the district court improperly restricted Chesterton's attempts to cross-examine the Company's tax expert regarding the nature and propriety of the management fee. We review the district court's decision to exclude evidence for abuse of discretion. *Stevens v. Bangor and Aroostook R.R. Co.*, 97 F.3d 594, 599 (1st Cir.1996). The district court limited Chesterton's proffered examination because it found that the testimony was collateral to the main issues in the case. The court also relied on the fact that for the years 1991 through 1993, the IRS had audited the Company's taxes and had made no adjustments or comments regarding the management fee. Such a ruling was well within the court's discretion.

## C. *Balance of Equities*

The final consideration regarding the propriety of injunctive relief is whether,

on balance, the harm plaintiffs will suffer from the proposed transfers outweighs the harm that Chesterton will suffer if his transfers are enjoined. The district court found that an injunction would not harm Chesterton because the proposed sales would do little to advance his efforts to sell the stock. The court stated that, "if [Chesterton] was unable to find a buyer for his shares in the Company, it strains logic to believe that he would be able to find a buyer for shares in [the shell corporations] when their primary assets are the very same shares he was previously unable to sell." Chesterton claims that by transferring the shares to his shell corporations, he will somehow increase the liquidity of those shares. The claim is counter-intuitive and no evidence was presented to support it. On this record, the district court's finding that the potential harm to plaintiffs outweighs the harm to defendant was proper.

## III. *Chesterton's Counterclaim for Relief Under 156B*

Finally, Chesterton appeals the district court's denial of his claim for relief under Mass. Gen. Laws ch. 156B. Chesterton argues that even if the district court properly determined that the Subchapter S election impliedly restricted the shareholders' rights to transfer their stock to a corporation, he is now entitled to notice and to the exercise of his dissenter's rights under 156B. He asserts that the district court's decision is the first notice of the restriction that he has had, and that under 156B he is now entitled to dissent from the restriction and enforce his appraisal rights. Chesterton's claim to 156B appraisal rights fails for the same reason that his general 156B argument fails: that provision is not triggered by this situation. The district court correctly denied Chesterton's misdirected claim to 156B appraisal rights.

The decision of the district court is *affirmed.*