Haggerty, S. Jane, J.
INTRODUCTION
On June 15, 2010, the plaintiff shareholders of Demoulas Super Markets, Inc. (DSM), provided written notice to DSM’s Board of Directors of their desire to sell their DSM stock, in accordance with the stock transfer restriction provision in Article 5 of DSM’s Articles of Organization. Pursuant to Article 5, the plaintiffs appended to their written notice a proposed stock purchase agreement stating the terms upon which the plaintiffs were willing to sell their shares and, as an alternative, designated an arbitrator that the Board could select at its option to ascertain the value of the shares. On July 6, 2010, the Board (by a vote of four members out of seven) determined that the plaintiffs’ notice was invalid and took no further action. On July 14, 2010, however, the Board adopted resolutions acknowledging receipt of the notice and of the attached proposed stock purchase agreement. The Board elected not to purchase the shares on the terms set forth in the proposed agreement, but rather elected to proceed to arbitration for valuation of the shares by naming a second arbitrator, consistent with the terms of Article 5. The Board stated that it was reserving its right to contest the validity of the initial notice in the future.
On July 16, 2010, the plaintiffs filed this complaint for declaratory relief (Count I), seeking a declaration that the written notice that they provided to the Board complied with the terms of Article 5 and, further, that the Board’s decision to commence the arbitration process bars it from challenging the validity of the notice going forward. The plaintiffs also allege breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and, alternatively, breach of fiduciary duty (Count IV) against the four Board directors. The plaintiffs seek damages on Counts II, III and IV.
On August 6, 2010, DSM answered and asserted counterclaims for the following declarations: (1) once the Board rejected the plaintiffs’ proposed stock purchase agreement, the proposed terms were of no further effect; (2) once the arbitrators have been selected, DSM has the absolute right to purchase the shares at the value ascertained by the arbitrators without regard for the terms of the plaintiffs’ proposed agreement; (3) once the arbitration process has begun, no party has the right to terminate the arbitration process; and (4) if the proposed agreement is still in effect after its rejection by the Board, it is inconsistent with Article 5 and thus invalid (collectively, Counterclaim Count I). DSM also asserted counterclaims for the *285 following declarations: (5) the plaintiffs are bound by their fiduciary duties not to sell their shares to any entity that would defeat DSM’s right to qualify as a Subchapter S corporation (Counterclaim Count II); and (6) if DSM elects not to purchase the shares at the value ascertained by the arbitrators, the plaintiffs may not sell the shares to a third party at a lower value unless they first offer to sell the shares to DSM for that lower value (Counterclaim Count III).
On August 6, 2010, individual defendants Shea, Carleton, and Roazen answered and asserted counterclaims for a declaration that the plaintiffs’ notice and tender were invalid (Counterclaim Count I), or, in the alternative, for a declaration of the rights and obligations of the parties under Article 5 (Counterclaim Count II).
Defendant Darman moved to dismiss the counts against him pursuant to Mass.R.Civ.P. 12(b)(6) for failure to state a claim. The plaintiffs opposed Damian’s motion as to Counts I, II and III, but noted that they would not object to a determination by this court that, pursuant to Chokel v. Genzyme Corp., 449 Mass. 272, 275-78 (2007), contract law, rather than fiduciary law (Count IV), governs the parties’ conduct with respect to Article 5.
Thereafter, the plaintiffs moved to dismiss Count II of Shea, Carleton, and Roazen’s counterclaims for lack of standing or, alternatively, for failure to state a claim. They also moved to dismiss Counts II and III of DSM’s counterclaims for failure to state a claim.
More recently, the plaintiffs and DSM/Shea, Carlton, and Roazen cross moved for judgment on the pleadings—the plaintiffs, for declarations that their written notice was valid and that the Board waived its right to challenge the validity of the notice; DSM, for a declaration consistent with each of its counterclaims; and Shea, Carlton, and Roazen, for a declaration that the Board retains the option to purchase at the arbitrators’ price without consideration of the terms set forth in the plaintiffs’ proposed stock purchase agreement (which essentially parallels Count I of DSM’s counterclaim). Darman opposed the plaintiffs’ motion for judgment on the pleadings on the grounds set forth in his motion to dismiss.
On January 19, 2011, while the aforementioned motions were under advisement, DSM filed a motion titled “Notice of Mootness of Certain Issues in Pending Motions, in which it asserted that the arbitration process at the forefront of the dispute had concluded, thereby rendering moot the following: (1) the plaintiffs’ motion for judgment on the pleadings as to Count I of their complaint, to the extent that it seeks declarations that their notice was valid to trigger the arbitration process and that DSM waived its right to contest the validity of the notice; and (2) DSM’s cross motion for judgment on the pleadings as to Count I of its counterclaims, which seeks declarations relative to the terms and scope of arbitration. DSM contends that all that remains for the court to consider are (1) subpar-agraph 5 of prayer 2 of the plaintiffs’ request for declaratory relief, which relates to the effect of DSM’s Subchapter S status on the plaintiffs’ right to transfer their stock; and (2) Counts II and III of DSM’s counterclaims, regarding the Subchapter S issue and whether DSM retains a perpetual right of first offer under Article 5. For their part, the plaintiffs do not oppose the motion insofar as it narrows the live issues for declaratory judgment; however, they reserve the right to press forward on their claims against the individual defendants.
To summarize, the matter is before the court on (1) Plaintiffs’ motion for judgment on the pleadings as to Count I of their complaint (Pleading No. 24); (2) DSM’s and Shea, Carleton, and Roazen’s cross motions for judgment on the pleadings on their counterclaims (Pleading Nos. 25 and 26); (3) Plaintiffs’motion to dismiss Counts II and III of DSM’s counterclaims (Pleading No. 22); (4) Plaintiffs’ motion to dismiss Count II of Shea, Carleton, and Roazen’s counterclaims (Pleading No. 23); and (5) Darman’s motion to dismiss the plaintiffs’ complaint against him (Pleading No. 14).
DISCUSSION
I. Plaintiffs’ Motion for Judgment on the Pleadings as to Count I of Complaint
The plaintiffs initially sought a declaration that the written notice they provided to the Board complied with the terms of Article 5 and, further, that the Board’s decision to commence the arbitration process barred it from challenging the validity of the notice going forward. Presumably, they sought a declaration to this effect so that, in the event that the plaintiffs prevailed in their argument that the proposed terms of their written offer to sell carried forward even after arbitration, the Board would effectively be “locked in” to purchasing the stock at the arbitrators’ price and on the plaintiffs’ terms (however unreasonable they might be). Otherwise, the plaintiffs would have been free to sell to third parties.
At a hearing on March 11, 2011, the parties represented that they had completed the Article 5 arbitration process while the court held these matters under advisement, and that the Board had declined to purchase the plaintiffs’ shares at the price set by the arbitrators. Because the arbitration process has concluded and the defendants no longer contest the validity of the plaintiffs’ notice, the plaintiffs’ motion for judgment on the pleadings as to Count I, and all corresponding cross motions on that particular issue, are moot. There is no question that the plaintiffs may offer their shares to a third party in accordance with last sentence of Article 5; the sole question that remains is whether there are any restrictions, contractual or otherwise, on the manner in which the plaintiffs may dispose of their stock. Therefore, the court shifts its focus to DSM’s second and third counterclaims.
*286 II. DSM’s Cross Motion for Judgment on the Pleadings as to Counts II and III of Its Counterclaim
A. Count II (Subchapter S)
In Count II of its counterclaim, DSM seeks a declaration that the plaintiffs have a fiduciary duty not to dispose of their stock in a manner that would destroy the corporation’s Subchapter S status. See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 4-7 (1st Cir. 1997) (implicit in shareholders’ agreement to elect Subchap-ter S status was understanding that they would take no action to destroy such status, and minority shareholder’s attempt to sell shares in manner destructive to Subchapter S status was breach of fiduciary duty).[3]
In support of a completely contrary position, the plaintiffs rely on Chokel v. Genzyme Corp., 449 Mass. 272 (2007). When rights of stockholders arise under a contract [such as the corporation’s articles of organization, id. at 275] .. . the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern." Id. at 278. In Chokel, the Supreme Judicial Court held that, notwithstanding the fact that a corporation’s directors owe a fiduciary duly to their shareholders, the motion judge properly dismissed the plaintiff shareholder’s claims that the defendant directors breached a fiduciary duiy based on the timing of a stock exchange, where the procedure for exchanging stocks fell squarely within the corporation’s articles of organization. M.[4]
Other cases support this general principle. See BPR Group Ltd. Partnership v. Bendetson, 453 Mass. 853, 863 (2009) (“Where an agreement addresses a particular issue, the terms of the agreement control, and the rights and obligations of the parties are determined by reference to principles of contract law”); Blank v. Chelmsford OB/GYN, P.C., 420 Mass. 404, 408 (1995) (“However, questions of good faith and loyalty with respect to rights on termination or stock purchase do not arise when all the stockholders in advance enter into agreements concerning termination of employment and for the purchase of stock of a withdrawing or a deceased stockholder. See [Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578,] 598 n.24 [1975]; Evangelista v. Holland, 27 Mass.App.Ct. 244, 248-49 (1989)”); Knapp v. Neptune Towers Assocs., 72 Mass.App.Ct. 502, 507 (2008) (“In this case, the procedure for hiring a broker and selling the partnership property falls squarely within the contract, and the duties the general partners owed the limited partners are circumscribed by the terms in the partnership agreement”). Cf. Nahill v. Raytheon Co., 2009 WL 909813, at *3 & n.7 (Mass.Super. Dec. 11, 2008) (Fabricant, J.) [25 Mass. L. Rptr. 320] (applying Delaware law, but observing that Massachusetts also follows rule that where “a dispute arises from rights and obligations created by a contract between the corporation and a particular shareholder or class of shareholders, no fiduciary duly extends obligations beyond those provided by contract; in such an instance, the dispute is governed by contract principles, not equitable principles”). Indeed, “(t]o allow a fiduciary duty claim to coexist in parallel with an implied contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving the essential contractual rights and obligations of [the] shareholders.” Nahill, 2009 WL 909813, at *3, quoting Wood v. Baum, 953 A.2d 136, 143 n.23 (Del. 2008).
In the same vein, the procedure for DSM shareholders to dispose of their stock falls squarely within Article 5 of the Articles of Organization. Therefore, in the plaintiffs’ view, any obligations the minority shareholders owe the majority shareholders with respect to the manner of sale are determined only by the terms of that provision. See, e.g., Chokel, 449 Mass. at 278. At this stage in the process, they point out, the provision authorizes the plaintiffs to sell “in any manner [they] may see fit.”
It is worth noting that, provided certain procedures are followed, the Massachusetts Business Corporations Act authorizes corporations to impose restrictions on the transfer of shares to, among other things, “maintain the corporation’s status when it is dependent on the number or identity of its shareholders.” G.L.c. 156D, §6.27(c)(1). DSM did not include in its Articles of Organization an explicit restriction to insure its Subchapter S status. The relevant question, then, is whether, as the plaintiffs argue, Chokel requires the court to disregard fiduciary principles and instead to strictly construe Article 5 to permit the plaintiffs to sell their stock as they see fit, or whether fiduciary law complements contract law and restricts the plaintiffs’ ability to sell by requiring that they not act in a manner contrary to the corporation’s interests.
Based on the plain language of the aforementioned cases, the plaintiffs appear at first blush to have the better of the argument. However, this court would be remiss if it did not look beyond the broad language in Chokel to determine its relationship to other Massachusetts cases dealing specifically with the fiduciary obligations of shareholders in close corporations. For the reasons that follow, this court concludes that the plaintiffs do not owe DSM a fiduciary duly to refrain from selling their shares in a manner that terminates DSM’s Subchapter S status, but that their freedom to sell under Article 5 is nevertheless subject to the implied covenant of good faith and fair dealing.
To start, this court acknowledges a recent Supreme Judicial Court decision distinguishing Chokel on the grounds that it involved a public corporation. Pointer v. Castellani, 455 Mass. 537, 554 (2009). In Pointer, the plaintiff was a member of a limited liability company, treated as a close corporation, who had been frozen out by the other members. Id. at 538, 549. In response to the defendants’ argument that the terms *287 of Pointer’s employment contract controlled, rather than their fiduciary duty, the Court pointed out that Chokel, on which the defendants relied, involved a company whose stock was publicly traded. Id. at 554.
On the surface, this would seem to suggest that Chokel's reach does not extend beyond public corporations. However, the Blank case, on which Chokel relied for the proposition that shareholder rights arising under contract are not governed by fiduciary principles, did involve a close corporation. Blank, 420 Mass. at 404-05, 408. See Fronk v. Fowler, 456 Mass. at 331-32. There, the Supreme Judicial Court held that the plaintiff shareholder’s termination was authorized by an employment agreement among the shareholders, which permitted the board to terminate the plaintiff without cause upon proper notice, and that the propriety of the events leading to the termination was to be evaluated in terms of the implied covenant of good faith and fair dealing applicable to contracts, rather than the shareholders’ fiduciary duties of good faith and loyalty. Blank, at 407-09. Contrast Pointer, 455 Mass. at 542, 554 (fiduciary principles governed where employment agreement appointing plaintiff as president of close corporation stated that he could be terminated only on certain grounds, e.g., violating the employment agreement, and the evidence supported the judge’s conclusion that the plaintiff had not violated the agreement). These two cases may be reconciled in that fiduciary duties may still govern where shareholders act in a manner inconsistent with the express terms of a shareholder agreement, but that courts will not entertain fiduciary claims where a shareholder’s action falls clearly within the scope of an agreement. See id. at 554 (distinguishing cases concerning terminations that were consistent with applicable employment contracts).
In this case, Article 5 does not impose any explicit restrictions on the sale of stock to third parties once the Board has declined to purchase at the arbitrators’ valuation, and there are no other conditions precedent to such a sale (i.e., termination only upon violation of an employment agreement, as in Pointer) that might call into question the plaintiffs’ compliance with the letter of Article 5.
DSM suggests that, even after Chokel courts must look to the parties’ understanding of their rights and obligations in evaluating their conduct. See O’Brien v. Pearson, 67 Mass.App.Ct. 29, 36 n.10 (2006), rev’d on issue of damages only, 449 Mass. 377 (2007) (“Whether the agreement [to acquire a subdivision] is legally enforceable as an independent contract is not dispositive with respect to an analysis regarding an alleged breach of fiduciary duty. An agreement such as this, a company policy, or an understanding among stockholders may have bearing on the questions whether a duly existed and, if so, whether it was breached. [Citing Chesterton, 128 F.3d at 6-7.] The answers turn, of course, upon the terms of such agreement, policy, or understanding”). DSM argues that all parties understood that the Subchapter S election would survive any stock transfer, and that the plaintiffs “cannot defend a breach of fiduciary duly claim on the basis that [they have] not violated the Articles of Organization." Chesterton, 128 F.3d at 8.
In Sery v. Federal Bus. Ctrs, Inc., 616 F.Sup.2d 496 (D.N.J. 2008), a federal district judge grappled with the interrelationship between a stock transfer provision that imposed no restriction regarding the company’s Subchapter S status and the shareholders’ common-law fiduciary duties of good faith and loyalty. Id. at 501-02. The plaintiffs there argued that the absence of any Subchapter S restrictions on stock transfers gave them unfettered ability to sell their shares in the manner of their choosing. Id. at 501. In attempting to divine what the New Jersey Supreme Court would say on the matter, District Judge Chesler found “no reason why the common law duties of good faith and loyalty cannot complement the statutory provisions governing restrictions on the transferability of S corporation stock.” Id. at 502. He settled for a test that focused on the sellers’ motives, concluding that “the fiduciary duties of good faith and loyalty restrict the sale or transfer of S corporation stock to the extent that these duties bar a shareholder from entering into a bad faith or sham transaction which destroys the corporation’s Subchapter S status for the primary purpose of injuring fellow shareholders.” Id. On the other hand, “where the shareholder sells or transfers their S corporation shares in good faith in an economically reasonable manner, even if that entails a sale to an unqualified entity, [the court] would uphold the sale.” Id.
Significantly, the Sery court was interpreting New Jersey law, and it. was not confronted with a decision from the state’s highest court that unambiguously provides that parties may displace their fiduciary obligations via contract. See Chokel, 449 Mass. at 278. Despite the intuitive appeal of Sery’s “hybrid” approach, this court is not at liberty to fashion a test rooted in fiduciary principles, as the plaintiffs’ ability to transfer their shares plainly falls within the scope of Article 5. See id.
It may well be that, given the opportunity, the Supreme Judicial Court would reject an expansive interpretation of Chokel and adopt the Chesterton view that fiduciary principles attach to the sale of stock pursuant to a contractual provision. There is certainly support for this stance in Smith v. Atlantic Props., Inc., 12 Mass.App.Ct. 201 (1981), and the factual circumstances of Chokel and the cases relying thereon are distinguishable from this case.
In Smith, the defendant shareholder was one of four members holding equal voting shares in the company, and the plaintiff shareholders were the other three members. Id. at 202. The company’s articles of orga *288 nization included a provision that required a vote by eighty percent of the voting stock before the company could, among other things, distribute dividends. Id. The effect of this provision was that any one shareholder could veto corporate decisions. Id. Noting that the provision allowed a single minority shareholder to become an “ad hoc controlling interest,” the Appeals Court held that Massachusetts case law appeared to favor a weighing of business interests in determining whether the minority shareholder’s exercise of his rights violated his fiduciary duty. Id. at 207-08. The Appeals Court found guidance in a law review article that stated:
In spite of the . . . imprecision of such criteria for evaluating commercial behavior as good faith, commercial reasonableness, and unconscionability, the courts have moved toward imposing minimum requirements of fair dealing in nonfiduciary business situations. The similarly imprecise concept of fiduciary responsibility, at least as applied to majority shareholders . . . has clearly promoted fair dealing within business enterprises. The majority may not exercise their corporate powers in a manner which is clearly intended to be and is in fact inimical to the corporate interest, or which is intended to deprive the minority of its pro rata share of the present or future gains accruing to the enterprise. A minority shareholder whose conduct is controlling on a particular issue should be bound by no different standard.
Id. at 208 n.9, quoting Hetherington, The Minority’s Duty of Loyally in Close Corporations, 1972 Duke L.J. 921, 946.
Here, as in Smith, the plaintiffs’ unfettered exercise of their freedom under Article 5 would give them ad hoc control over DSM’s tax consequences. See Smith, 12 Mass.App.Ct. at 209. At minimum, Smith suggests that the plaintiffs’ freedom to sell their shares “in any manner [they] may see fit” is circumscribed by the requirement that they exercise their rights under Article 5 in good faith and for a legitimate purpose. See Smith, 12 Mass.App.Ct. at 207-08, citing Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 849-52 (1976). See also Blaiklock, Fiduciary Duties Owed by Frozen-Out Minority Shareholders in Close Corporations, 30 Ind.L.R. 763, 772-73 (1997).
Despite compelling support in pre-Chokel cases for application of a fiduciary duty to the plaintiffs’ exercise of their Article 5 rights, this court is reluctant to stray too far from the general rule set forth in Blank, Chokel and their progeny that contract law governs when all stockholders in advance enter into agreements regarding certain rights and obligations. The matter does not end there, however. Even if Chokel tacitly overruled Smith by signaling that the fiduciary duties of utmost good faith and loyalty are not the proper vehicles for limiting a minority shareholder’s ad hoc control over corporate affairs, the law plainly affords aggrieved parties in a close corporation some check on the manner in which shareholders exercise their contractual rights. See Chokel, 449 Mass. at 276 (directors bound to act in accordance with implied covenant of good faith and fair dealing with respect to performance of obligations created in articles of organization); Blank, 420 Mass. at 408-09 (“Because there is a stock purchase agreement, the method of determining the value of the plaintiffs shares on proper termination is not subject to question. A duty of good faith and fair dealing exists during the course of events leading up to and including termination, but that duty is to be evaluated in light of an agreement that permits termination by either parly without cause on notice”). Accordingly, even if the plaintiffs’ rights and obligations were determined solely by reference to contract principles, their sale of stock would still be subject to the covenant of good faith and fair dealing implied in DSM’s Articles of Organization.
The parties did not frame their arguments on the Subchapter S issue in terms of an implied covenant of good faith and fair dealing. To the extent that DSM might argue that the plaintiffs’ sale of shares in a manner destructive to DSM’s interests would breach the covenant of good faith and fair dealing implied in the Articles of Organization, this court notes simply that the implied covenant ensures that parties “remain faithful to the intended and agreed expectations of the contract,” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004), and “[a] breach occurs when one party violates the reasonable expectations of the other” (emphasis supplied). Chokel, 449 Mass. at 276. “The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract” (internal quotations and citations omitted). See id. The plaintiffs’ right to dispose of their shares, though not subject to scrutiny under fiduciary principles, is nevertheless circumscribed by the covenant of good faith and fair dealing implied in Article 5. On the limited record before the court, any claim by DSM that the plaintiffs have breached or intend to breach the implied covenant is premature.
In reaching its conclusion, the court has considered DSM’s alternative argument that the 1986 Subchapter S election and the 2002 memorandum of agreement retrospectively confirming the corporation’s Subchap-ter S status for the tax years 1994 to 2000 constituted separate agreements among the shareholders not to terminate DSM’s status. According to DSM, Article 5, when read in conjunction with the parties’ agreement regarding DSM’s Subchapter S status, must be construed in light of the parties’ subsequent agreement not to transfer their stock in a manner that would terminate the Subchapter S status. See Chesterton, 128 F.3d at 6. If the agreement regarding Subchapter S status were independently enforceable, then it would not matter whether, as the plaintiffs contend, Chokel *289 trumps Chesterton, because the restriction on the sale of stock so as to destroy DSM’s Subchapter S status would derive not from fiduciary law, but from basic principles of contract interpretation.
As District Judge Chesler noted in Sery, “finding that a shareholder is bound forever by the decision to elect Subchapter S status is a bridge too far.. .” 616 F.Sup.2d at 505. Moreover, the complex procedural history between these parties and how they came to hold their respective shares casts serious doubt on the fairness of binding them in perpetuity for their acquiescence to prior tax elections.[5] The fact that the Subchapter S election has generally benefitted the plaintiffs as well as DSM’s majority shareholders may resonate as an equitable consideration, but it is not a persuasive argument in favor of placing artificial restrictions on the alienability of shares under an independent contract theory. Even assuming arguendo that an undercurrent of fiduciary law imbues the parties’ respective rights and obligations even when they are covered by a contract, the present case is sufficiently distinguishable from Chesterton to justify a different result.
In Chesterton, the First Circuit upheld a permanent injunction against a minority shareholder, Chesterton, who had grown frustrated with the company’s direction and devised a scheme to transfer his 27 percent interest to two shell corporations wholly-owned by him, which would have destroyed the company’s Subchapter S status. 128 F.3d at 5. Chesterton was the company’s single largest shareholder and, as an officer and director, had participated heavily in the Subchapter S election process. Id. at 3-4. Although the Articles of Organization gave the company a right of first refusal to purchase Chesterton’s shares, the company lacked the financial ability to do so. Id.
While the First Circuit rejected Chesterton’s argument that he had a “legitimate business purpose” for his scheme based on its interpretation that the test inures only to the benefit of corporations, rather than shareholders,[6] it went on to note that Chesterton did not have a legitimate purpose, nor would transferring a portion of his shares to two shell corporations enhance the market for the shares or enable him to achieve complete divestment. Id. at 7-8.
The present case differs in several respects, two of which are particularly significant: (1) there is no evidence here, as in Chesterton, that the plaintiffs plan to transfer their shares for the sole purpose of destroying DSM’s favorable tax status; and (2) DSM chose not to purchase the plaintiffs’ shares, despite having two distinct opportunities to do so—once on the plaintiffs’ terms and once on the arbitrators’ terms. Whereas the balance of equities in Chesterton weighed strongly in favor of prohibiting a spiteful shareholder from harming a close corporation that did not have the financial means to buy out his shares, here there is no indication that DSM lacked the ability to purchase the plaintiffs’ shares at the arbitrators’ valuation, and it has offered no explanation for its decision to forego the purchase. The court infers from the nature of DSM’s requests for declarations that it had strategic reasons for declining to purchase the plaintiffs’ shares through the Article 5 process.
Regardless of DSM’s motives, this court would not have been inclined to follow the result in Chesterton, even if it had concluded that Chokel did not abrogate common-law fiduciary duties in the context of contractual stock transfer provisions. Instead, this court would have declared that the “legitimate business purpose” test applies to the plaintiffs’ exercise of their freedom under Article 5. See note 6, supra.
B. Count III (Right of First Offer)
DSM’s argument that its right of first offer survives in perpetuity upon any change in the price or terms offered to the Board appears to be premised on DSM’s baseless assumption that the plaintiffs may only offer their shares to third parties at the value determined by the arbitrators, and that, if they are unable to secure an outside buyer on those terms, then their “offer” is terminated and the process starts anew. This interpretation is flatly inconsistent with the plain language of Article 5 and, unlike DSM’s claim for a Subchapter S restriction, which at least arguably finds support in the case law and the record of the parties’ dealings, there is nothing before this court to support DSM’s view that its explicit right of first offer is, in effect, a never-ending right of refusal.
If the court were to give effect to DSM’s reading of the right of first offer in Article 5—that, if the Board elects not to purchase at the arbitrators’ price and the plaintiffs elect to sell to a third party at a lower price or on more favorable terms, they must present the terms of this “new offer” to the Board—the result would be to eviscerate the last sentence of the provision, which states that, upon the Board’s election not to purchase, “the owner of the stock shall be at liberty to dispose of the same in the manner he may see fit.” Indeed, under this construction, the shareholder’s reward for reaching the end of the arbitration process, during which the Board has all the leverage in determining whether to purchase the shares, would be to start the process all over again upon the slightest change in the price or terms offered to a third party. Given the animosity between these parties, it is easy to imagine the shenanigans that would ensue if this were the case.
This court will not countenance, an artificial stock transfer restriction that empowers DSM to add new obstacles to the plaintiffs’ divestment of their shares. The Board’s Article 5 protection against unfettered stock transfers and unwanted outsiders is to: (1) purchase the stock at the price and terms that the plaintiffs propose, or (2) purchase the stock at the price set by the arbitrators. This protection is adequate, given the Board’s considerable leverage throughout the process in deciding whether to purchase. If the Board fails to avail itself of its options, *290 Article 5 provides no additional recourse to prevent sale of the stock to third parties on more favorable terms and no plausible claim for breach of the implied covenant of good faith and fair dealing exists.
III.Plaintiffs’ Motion to Dismiss Counts II and III of DSM’s Counterclaim for Failure to State a Claim
In view of the court’s disposition of DSM’s cross motion for judgment on the pleadings on its counterclaims, no action is necessary on the plaintiffs’ motion to dismiss Counts II and III.
IV.Plaintiffs’ Motion to Dismiss Count II of Shea, Carleton, and Roazen’s Counterclaim for Lack of Standing or, Alternatively, for Failure to State a Claim
Because Count II of Shea, Carleton, and Roazen’s counterclaim essentially parrots Count I of DSM’s counterclaim, which the court has addressed by way of DSM’s cross motion for judgment on the pleadings, no action is necessary.
V.Darman’s Motion to Dismiss Plaintiffs’ Complaint
Darman moves to dismiss the counts against him pursuant to Mass.R.Civ.P. 12(b)(6) for failure to state a claim. The plaintiffs oppose Darman’s motion as to Counts I, II, and III, but would not object to a determination by this court that, pursuant to Chokel v. Genzyme Corp., 449 Mass. 272, 275-78 (2007), contract law, rather than fiduciaiy law (Count IV), governs the parties’ conduct with respect to Article 5.
The plaintiffs’ contract claims (Counts II and III of their complaint) are based on the Board’s July 14 reservation of a right to challenge the validity of the plaintiffs’ written notice under Article 5.
“Under Massachusetts law, a corporation’s articles of organization form a contract between the corporation and its shareholders.” Chokel, 449 Mass. at 275. The plaintiffs assert no basis for holding Darman individually liable for DSM’s alleged breach of its contractual obligations under Article 5. Accordingly, the court allows Darman’s motion to dismiss as to Counts II (breach of contract) and III (breach of the implied covenant of good faith and fair dealing). With respect to Count IV, the court allows the motion to dismiss on the grounds that contract law, rather than fiduciaiy law, applies. See id.
Darman is also entitled to dismissal of Count I because his individual participation is no longer required to resolve the controversy surrounding the validity of the plaintiffs’ Article 5 notice and the Board’s reservation of the right to contest said notice.
ORDER
For the foregoing reasons, it is hereby ORDERED that Darman’s motion to dismiss (Pleading No. 14) be ALLOWED. It is further DECLARED that:
1. The plaintiffs are not bound by fiduciaiy duties with respect to their disposition of their shares in accordance with Article 5, even if the consequence of such disposition is that it causes DSM to lose its Subchapter S status. However, the plaintiffs must exercise their Article 5 rights in a manner that comports with the implied covenant of good faith and fair dealing.
2. Article 5 does not require the plaintiffs to re-offer their shares to DSM before selling them to third parties on terms more favorable than those set by the designated arbitrators.

“In order to qualify for Subchapter S treatment, a corporation must be a domestic corporation which does not: (1) have more than seventy-five shareholders, (2) have a corporation or other non-individual as a shareholder, (3) have a non-resident alien as a shareholder, and (4) have more than one class of stock. 26 U.S.C. §1361(b). Failure to abide by any of these limitations results in automatic termination of Sub-chapter S status. 26 U.S.C. §1362(d)(2).” Id. at 3.

 Chokel has since been addressed and reaffirmed in Fronk v. Fowler, 456 Mass. 317, 331-32 (2010).

In Chesterton, the First Circuit did not quarrel with the district court’s conclusion that “[b]y unanimously electing S status, the shareholders agreed that they would not act in any way that would cause the Company to lose the considerable benefits of S status.” 128 F.3d at 6, quoting A.W. Chesterton Co. v. Chesterton, 951 F.Sup. 291, 295 (D.Mass. 1997).
The plaintiffs represented during the March 11 hearing that, because they had been the victims of a fraud perpetrated by other shareholders in the close corporation during the relevant period, they were not even aware that they owned shares at the time DSM’s purported shareholders unanimously consented to Subchapter S treatment. If this is true, and the court has no reason to doubt that it is, then DSM’s argument that the plaintiffs were parties to a binding Sub-chapter S agreement that modified Article 5 rings especially hollow.

A subsequent First Circuit decision rejected the suggestion that a minority shareholder may never, under the legitimate business purpose test in Donahue (as modified by Wilkes), take its own interest into account in exercising its shareholder rights, calling the argument “both unrealistic and too biased.” Medical Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 21 (1st Cir. 2002).
This view comports more closely with the spirit of Donahue, inasmuch as it treats minority and majority shareholders alike regardless of percentages of ownership. Although the “legitimate business purpose” test was fashioned specifically as a check against controlling groups in close corporations, see Wilkes, 370 Mass. at 851-52, the same principles apply where majority shareholders in a close corporation challenge an action by minority shareholders that affects the company’s operations. See Zimmerman v. Bogoff, 402 Mass. 650, 657-58 (1988) (applying legitimate business purpose test to 50 percent shareholder in close corporation and stating that “(t]he protections of Donahue are not limited to those with less than 50% share ownership”).